## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Bankr. No. 10-10146 |
| | ) | Chapter 11 |
| VEBLEN EAST DAIRY | ) | |
| LIMITED PARTNERSHIP, | ) | |
| Tax ID No.: 20-8870979 | ) | DEBTOR'S RESPONSE TO AGSTAR'S |
| | ) | MOTION TO EXCUSE COMPLIANCE |
| Debtor. | ) | WITH 11 U.S.C. § 543 |

Veblen East Dairy Limited Partnership (the "Debtor") files this memorandum and the related affidavit of Steven Nerger, the Chief Restructuring Officer of the Debtor, in response to the motion of AgStar Financial Services, PCA and AgStar Financial Services, FLCA ("AgStar") to excuse compliance with 11 U.S.C. §543.

1.      The Debtor opposes the motion on the following grounds:

a.      The receiver has relinquished control of the property of the estate and cannot be reinstated;

b.      The receiver mistakenly has concluded that liquidation of the Debtor's assets is the only viable course of action in this case to the detriment of all creditors except AgStar;

c.      Continued operation of the Debtor can be supported by the Debtor's cash flow; and

d.      A plan of reorganization can be confirmed in this case.

## 2.      **Background**

This case was commenced by voluntary petition on July 2, 2010.  At that time, the Debtor's assets were under the control of Value-Added Science & Technologies, LLC, a receiver appointed by the Minnesota District Court in Blue Earth County (the "Receiver").

On May 3, 2010, the Receiver filed a report with the District Court which recommended orderly liquidation of the Debtor's livestock, which consists primarily of dairy cows in production. A copy of the report is attached hereto as Exhibit A. The producing livestock is the only source of income for the Debtor.

The conduct of the receivership by the Receiver has been the subject of dispute in the District Court. Other parties in interest objected to the sale of the Debtor's livestock as imprudent and not in the interests of all creditors of the Debtor. The District Court held an evidentiary hearing on the issues in May and then requested post-hearing briefing. Copies of those briefs, which crystallize the issues before the District Court, are attached hereto as Exhibits B-E. The matter remains under advisement in the District Court.

Based on the conclusion of the Receiver to sell the livestock, the Debtor determined to file this case to avoid liquidation, reorganize its financial affairs, and preserve the going concern value of the business. As demonstrated by the Debtor's motion to approve use of cash collateral and the attached projections, the Debtor has concluded that it can continue to operate on its projected cash flow without additional protective advances from AgStar.

Issues concerning the management of the Debtor and Veblen West Dairy have been raised in the District Court action and in the chapter 11 case of Veblen West pending before this Court. In light of those issues, prior to commencement of the case, the Debtor engaged Steven Nerger of Silverman Consulting to act as Chief Restructuring Officer of the Debtor. In that capacity, Mr. Nerger has sole authority regarding the operations and financial affairs of the Debtor and, along with counsel, is responsible for discharging the Debtor's fiduciary duties in this case. This authority is clear from the resolutions appointing Mr. Nerger as CRO, which are attached as an exhibit to Mr. Nerger's affidavit. While Mr. Nerger only recently assumed his

position, he has reviewed the financial status and projections of the Debtor and believes that the Debtor's operations can be successfully operated and that a confirmable plan of reorganization that will provide a greater return to creditors than liquidation is likely in this case.

After this case was filed, the Debtor requested turnover of the property of the estate from the Receiver under §543 of the Bankruptcy Code. Mr. Nerger and the Receiver met on July 7 to discuss an orderly transition of management back to the Debtor. That process was completed and the Receiver and his staff left the Debtor's premises on July 7, 2010. The Receiver has advised Mr. Nerger that he is no longer exercising control over the Debtor's bank accounts. Thus, there is an urgent need for the Debtor to obtain use of cash collateral to pay expenses and avoid irreparable harm to the estate.

3.    **The Receiver cannot be reinstated under §543.**

The Receiver has performed all responsibilities imposed on him under §543 except the providing of an accounting under §543(b)(2). Accordingly, AgStar's motion is meaningless except as to that accounting requirement. Once a receiver turns over the property of the estate, the court may not revest the receiver with the Debtor's property. *In re Watkins*, 63 B.R. 46, 47 (Bankr. D. Colo. 1986). To the extent the motion seeks to reinstate the Receiver that remedy is not available under §543 and the Court should deny that request.

Moreover, the Receiver should not be relieved of the obligation to prepare and file and accounting. See F.R.Bankr.P. 6002. None was filed in the District Court. Parties in interest have no understanding of the management of the cash and assets of the receivership unless such an accounting is provided.

4.    **Relief from the requirements of §543 is not justified.**

If the Court finds that relief from the requirements of section 543 is to be considered, the following factors are those the Court should consider in making that determination: (1) whether there is sufficient income to fund a successful reorganization; (2) whether the Debtor will use the property turned over by the custodian for the benefit of creditors; and (3) whether there has been mismanagement by the Debtor. *In re Constable Plaza Assoc., L.P.,* 125 B.R. 98, 103 (Bankr. S.D.N.Y. 1991). The party seeking relief from the turnover provisions of section 543 has the burden on all issues necessary to sustain that relief. *In re Northgate Terrace Apartments, Ltd.,* 117 B.R. 328 (Bankr. S.D. Ohio 1990).

The Debtor's projections attached to its motion for use of cash collateral are the best measure of the income available to fund a plan. Those projections show that the Debtor expects to accumulate over $250,000 in cash over that necessary to pay ordinary course expenses of the Debtor and adequate protection payments to AgStar through September, 2010. If the Debtor can so perform, it is reasonable to expect that the Debtor will file a plan of reorganization with the exclusivity period which will provide meaningful treatment for secured and unsecured claims against the Debtor. It is too early in the case to provide detail on the structure of the plan. However, based on current market conditions the Debtor should be able to generate sufficient earnings to develop a sound business plan upon which it can attract new investment capital.

The Debtor intends to use the property of the estate in a manner to maximize its value. That in turn will inure to the benefit of both secured and unsecured creditors. The Debtor acknowledges that the present fair saleable value of its assets is less than the amount of its debt, probably less than the secured debt. Thus, a liquidation of assets at today's values will likely benefit only AgStar. The Debtor submits that continued operations will only enhance the value

-4-

of those assets and make either a successful reorganization plan or a sale of the business as a going concern a greater likelihood.

Mismanagement of the Debtor's business is the final factor. The Debtor submits that no showing of mismanagement has been made. AgStar has sought the appointment of a chapter 11 trustee in Veblen West Dairy, a related case before this Court. One of the claims AgStar made in bringing that motion was mismanagement of that related business by Prairie Ridge Management, the same management company that managed the Debtor's business before the receivership. The Debtor submits that AgStar failed in its effort to show mismanagement at the hearing on that motion, just as it will fail in showing mismanagement of the Debtor.

That notwithstanding, the Debtor has taken measures to engage Mr. Nerger of Silverman Consulting as Chief Restructuring Officer to manage the financial affairs of the Debtor, including the control of cash, and to oversee operations. In the judgment of Mr. Nerger, it is wise to keep Prairie Ridge on in an operational capacity to maximize the cash generation and profitability of the business. Under these circumstances, the Debtor submits that the requisite mismanagement cannot and will not be shown.

5.    **Conclusion.**

Based on the foregoing, the Debtor requests that the Court deny AgStar's motion and require the Receiver to complete his responsibilities under 11 U.S.C. §543(b).

/s/ Thomas M. Tobin
Thomas M. Tobin
Attorney for Debtor
404 S. Lincoln
P.O. Box 1456
Aberdeen, SD 57401
Tele: (605) 225-1000
Fax: (605) 225-0625
Email: ttobin@nvc.net

AND

Michael L. Meyer
Attorney for Debtor
4545 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tele: (612) 332-8511
Fax: (612) 332-8302
Email:  mlmeyer@ravichmeyer.com

**EXHIBIT A**



**VALUE-ADDED SCIENCE & TECHNOLOGIES**

3782 9TH STREET, SW SUITE 1    MASON CITY, IA 50401    PH. (641)424-1515    FAX (641)421-8074

May 3, 2010

The Honorable Bradley C. Walker
Fifth Judicial District Court
Blue Earth County, Minnesota
Court File No. 07-CV-10-714

Dear Judge Walker:

Pursuant to paragraph 6 on page 9 of the Court's order of March 3, 2010, we are submitting our assessment of the financial and operating condition of Veblen East, short term viability forecasts and options for Veblen East, an identification of assets and liabilities of Veblen East, and our recommended course of action for the disposition of the Receivership Estate.

<u>Financial Position</u>

The February 28, 2010 balance sheet of Veblen East, internally prepared by Prairie Ridge Management and attached hereto as Exhibit A, indicates liabilities of $65.82 million (including debt held by its senior bank group of $31.3 million) and assets of $68.33 million. We have not had the opportunity to perform audit or review procedures with respect to this balance sheet, but PRM does work with the outside CPA firm Christianson & Associates, as earlier reported to the court in the Affidavit of Joel Cratz of that firm.

Though the balance sheet indicates a slight positive equity position, Veblen East is unable to pay its bills when they come due without protective advances from its senior lenders. Moreover, (a) though we have not performed a formal appraisal, the book value of productive assets (particularly livestock and land, property and equipment) would be substantially lower than a fair market value determination based on current operations and expected revenues and costs of operations, (b) the intercompany receivables on the balance sheet of $8.6 million[1] and intangible assets of $584,000 are realistically worth closer to zero, and (c) there is a significant manure liability (estimated at $1.5 million to $2.0 million) and environmental remediation costs facing the business which are not reflected in its books and records.

(1) Intercompany Receivables are detailed as follows, assuming no repayment for those entities which have filed for Chapter 11 bankruptcy protection, and uncollectible amounts assumed for Dairy Dozen Veblen (general partner of Veblen East and represented to have no material assets other than its investment in Veblen East) and Vantage Cattle Company (former heifer supplier, based on our discussions with PRM management and senior lender to Vantage Cattle Company):

|  | owed 2/28 | likely to be Collectible |
|---|---|---|
| The Bull Pen Restaurant | $ 29,416 | $ 29,416 |
| Dairy Dozen Veblen | 645,165 | - |
| Excel Dairy | 257,035 | - |
| Five Star Dairy | 106,522 | - |

| New Horizon Dairy | 23,135 | 23,135 |
|---|---|---|
| Prairie Ridge Mgmt Co | 68,680 | 68,680 |
| Shortfoot Calf Ranch | 88,447 | 88,447 |
| Vantage Cattle Company | 2,947,035 | - |
| Veblen West Dairy | 4,465,246 | - |
| Totals | $8,630,680 | $209,678 |

It should also be noted that the nature of conduct of operations of Veblen East and affiliate entities (the continual sharing and transferring of equipment and assets) makes it impractical to determine accurately, in some cases, which assets are owned by Veblen East. Recent conditions in the dairy production industry and near term industry outlook, coupled with the significant problems of Veblen East outlined herein, have created a significant decline in the fair value of production assets (livestock and facilities).

We believe that the fair value of assets is lower than the senior debt that is owed. Accordingly, the senior lenders represent the only group that has a realistic economic interest in Veblen East.

Near Term Cash Flow

Since the Receivership began on March 3, the senior lending group has needed to make $1.14 million in protective advances in order to cash flow the basic needs of the business. Of these advances, the receiver was compelled to make $787,000 in payments on behalf of affiliated entities, Veblen West, Five Star, New Horizon Farms, Prairie Ridge Management, Shortfoot Cattle Ranch and the Bullpen Restauraunt related to feed, payroll and cattle transfers, the nature of which was previously reported to the Court. A significant portion of these advances will presumably be discharged in the bankruptcy filings of Veblen West, Five Star and Dairy Dozen Thief River Falls.

In reviewing estimated continued operating expenses, production and milk prices (based on Chicago Mercantile Exchange futures), we believe that continued protective advances will be necessary for the next several weeks. Class III milk futures through February 2011 (all contracts which are trading as of April 30), coupled with historical milk premiums received by Veblen East, reflect estimated future revenues which are less than what has historically been the cash costs incurred by Veblen East, which would result in continued negative cash flow.

Prospects of Restructuring and/or Going Concern Sale

The best interests of the senior lenders might be served by continuing to operate the dairy so that it could be sold as a going concern or considered in a packaged sale, including the assets of affiliated companies, given the symbiotic nature of the relationships between Veblen East and the affiliated companies. A packaged sale would be particularly beneficial to Veblen East, since it has calving operations for the other dairies, an unusual factor in its design that makes it more dependent on being part of the group. However, we believe that this course is not reasonable because of many factors. Those factors are: (a) the ongoing cash drain, (b) the uncertainty – and clear lack of a cooperative relationship - around a transaction that might include affiliates, (c) the disruptive operational issues encountered during the course of our work (outlined below) and (d) the significant environmental issues which exist (also outlined below).

Moreover, a going concern sale of the herd versus an orderly liquidation for Veblen East would result in (a) a similar price for feed inventories (e.g., market price) since they are not perishable and can be

preserved, (b) a similar price for cows given that good milking cows are purchased by dairy producers to be placed into productive herds so are ascribed a "going-concern" type of price, (c) a potential discount for facilities due to the startup costs associated with starting operations with a new herd; this discount, however, might be offset by a buyer's desire to use its own genetics and build its own herd and also with changes in market conditions. With regard to the latter, of course market conditions could worsen and that is an unknown. However, given the recent down cycle, near term outlook and dairy producer's production costs relative to the market price for milk, we believe that conditions will improve in time.

Operational Issues

Since the Court's Order of March 3, 2010 , your Receiver has discovered  multiple of contractual arrangements, some  written, some oral and some claimed,  between and among entities and individuals. These "agreements" are in large measure for the benefit of the other entities and individuals and to the disadvantage of Veblen East Dairy. Such "agreements" include but are not limited to Bills of Sale and Assignments totaling $7.2 million which are noted on Exhibit A as amounts owed by Vantage Cattle Company and Veblen West Dairy. Contracts and transactions entered into between PRM and Rick Millner and other entities appear to involve an inherent conflict of interest that often disadvantages Veblen East and favors the other entities or individuals. Cancellation of such agreements, to the extent necessary to assure economic balance operationally, is both impractical and may violate Bankruptcy Laws in light of the filings that have occurred on April 7, 2010 in the states of South Dakota, North Dakota and Minnesota. Such filings were not contemplated by the Receiver at the time of our appointment on March 3, 2010.

The fact that Veblen East has been disadvantaged in these transactions is best evidenced by the staggeringly high amount owed Veblen East by affiliated entities as outlined above, with such amount growing to approximately $10 million through March 31, 2010.

Counsel for the Receiver has been provided four (4) separate lawsuits naming Veblen East Dairy as a defendant and seeking in excess of $800,000 aggregate recovery for reasons and under circumstances that relate to actions taken by management prior to establishment of this Receivership.

Since March 3, 2010, we believe that Rick Millner and PRM and persons acting on their behalf have acted contrary to the letter and spirit of the Court's Order of March 3, 2010, specifically at pages 4 and 5.  As of the date of filing this report, no stakeholder of any of the named defendants has sought modification of this Court's Order

We believe that the actions, inactions and positions taken by PRM and Rick Millner and entities over which they have operational control have sought to frustrate the continued operation of Veblen East Dairy  as a going concern and are a material factor underlying the recommendation to the Court by the undersigned.

Environmental Issues

The environmental concerns at Veblen East are significant and have required urgent action.  We have worked through a 25-page draft Compliance Agreement with the South Dakota Department of Environmental and Natural Resources ("DENR") to address the environmental infractions previously reported to the Court.  In addition, we have encountered additional significant issues that need to be remedied.  The disrepair of sand separation systems in the facility has resulted in an inordinate filling of

lagoon storage basins in recent weeks, and these lagoons are at near full capacity with a tight spring "window" to apply manure to fields.  Moreover, the owners of the majority of land approved in the DENR permit for Veblen East are also owners of Veblen East and guarantors of certain of its bank debt and have indicated an unwillingness to provide access to their land for manure disposal, which has caused the Receiver to identify and qualify new land owners to work with and virtually re-write its nutrient management plan, with cooperation from environmental consultants and the DENR.

Further, we discovered on April 12 that the Veblen East dairy was built without a leach field on its septic tank, and we believe this has resulted, from the beginning of its operations, in the leakage of human waste onto the south of its facility.

We believe that these environmental issues will best be resolved during a period of closure.  This is true because the environmental loading can be significantly curtailed or halted while the facility is closed. This factor, in addition to the problems outlined above, further supports our recommendation of temporary closure.

<u>Conclusion and Recommendation</u>

For the above reasons, VAST recommends that an orderly liquidation of the livestock of Veblen East be commenced as soon as practicable, that environmental remediation be performed during a period of closure, and that a sale of the land, property and improvements follows thereafter.

Respectfully submitted,

Steve Weiss, Value Added Science & Technologies, LLC,
   Receiver for Veblen East Dairy Limited Partnership

EXHIBIT A

**Veblen East**
**Summary Balance Sheet**
**As of February 28, 2010**

| | Feb 28, 10 | Adjustment | Adjusted Balance |
|---|---|---|---|
| **ASSETS** | | | |
| Current Assets | | | |
| Checking/Savings | -146,311 | | -146,311 |
| Accounts Receivable | 2,482,519 *(1)* | 7,250,517 | 9,733,036 |
| Other Current Assets | 3,133,788 | | 3,133,788 |
| Total Current Assets | 5,469,996 | 7,250,517 | 12,720,513 |
| | | | |
| Fixed Assets | 40,419,837 | | 40,419,837 |
| Other Assets | 15,191,899 | | 15,191,899 |
| **TOTAL ASSETS** | 61,081,732 | 7,250,517 | 68,332,249 |
| | | | |
| **LIABILITIES & EQUITY** | | | |
| Liabilities | | | |
| Current Liabilities | | | |
| Accounts Payable | 3,649,192 *(1)* | 7,250,517 | 10,899,710 |
| Other Current Liabilities | 24,110,749 | | 24,110,749 |
| Total Current Liabilities | 27,759,942 | 7,250,517 | 35,010,459 |
| | | | |
| Long Term Liabilities | 30,808,792 | | 30,808,792 |
| Total Liabilities | 58,568,734 | 7,250,517 | 65,819,251 |
| | | | |
| Equity | 2,512,998 | | 2,512,998 |
| **TOTAL LIABILITIES & EQUITY** | 61,081,732 | 7,250,517 | 68,332,249 |

(1)   Add back of "Assignments" that are not being recognized by Receiver with the
following affiliated entities:

Vantage Cattle Company - $2,610,948

Veblen West - $4,639,569

**EXHIBIT B**

# PATTERSON & PRAHL, L.L.P.

| CHARLES T. PATTERSON | *Attorneys at Law* | MARGARET M. PRAHL |
|---|---|---|
| tom.patterson@midwaye.net | | mm.prahl@midwaye.net |

25043 Little Water Lane
P.O. Box 767
Custer, South Dakota 57730

(605) 673-5223          (605) 673-4240 FAX

Mobile Phone 712-251-3255

June 7, 2010

<u>VIA FACSIMILE AND U.S. MAIL</u>

District Court Administrator
Blue Earth County Justice Center
P.O. Box 347
Mankato, MN 56002-0347

Attention:     Nancy Vogel, Court Reporter
               Judge Bradley Walker

RE:     AgStar Financial Services, PCA, et al.
        v. Veblen East Dairy Limited Partnership, et al.
        and Aaron Anderson, et al.
        Court File No. 07-CV-10-714 (Fifth Judicial District,
         Blue Earth County, Minnesota)

Dear Judge Walker:

As the attorney for the Receiver, VAST, I provide the following letter brief to the Court for its consideration in reference to the request by the Receiver for an Order that would provide for orderly liquidation of the animals at Veblen East Dairy in Veblen, South Dakota.

This letter brief is being provided via fax and e-mail simultaneously, pursuant to the Court's Order, to be received on June 7, 2010.

District Court Administrator
June 7, 2010
Page 2

OVERVIEW

This matter is fully submitted from and after the filing of a May 3, 2010, report to the Court by Steve Weiss, Exhibit 9 consisting of 5 pages. Subsequent to the filing of that exhibit and report, this matter was the subject of an evidentiary hearing on May 18 and recessed and continued to a conclusion on the morning of May 27, 2010.

The issue for the Court's determination is whether to accept the recommendation of the Receiver as reflected in his May 3, 2010, report and enter an order allowing for liquidation of the animals.

The Court has before it a series of exhibits numbered 1 through 8. Those exhibits reflect the 40% ownership of the general partner of Veblen East Dairy LP, Dairy Dozen Veblen, which is in default under a $2 million Promissory Note and Assignment that was provided in 2009 so additional capital could be provided for operations. Such obligation was secured by the 40% interest in Veblen East Dairy, LP held by Dairy Dozen Veblen, and additionally was secured by the 19% interest in Dairy Dozen Veblen held by Rick Millner. A notice of default and seizing of such ownership interests was provided by the 60% limited partners of Veblen East Dairy, LP. These circumstances together with the majority ownership of Veblen East Dairy, LP, by limited partners and foreign investors (represented by Attorney Jeff Sveen), effectively provide for 100% ownership and/or control of Veblen East Dairy LP. There is a court filing by Attorney Jeffrey Sveen indicating he does not object to the recommendations of the Receiver in entry of a corresponding order.

AgStar Financial Services, Plaintiffs herein, have indicated they consent to the requested order for liquidation.

The Defendants, other than Veblen East Dairy Limited Partnership, are affiliated companies some of which are in bankruptcy and some of which continue operations. Their principal objection seems to center upon two grounds. First, cessation of operations at Veblen East Dairy will have an adverse financial impact on their operations and second, they advance the argument that the Dairy can be operated profitably at some future time and, therefore, an order allowing for liquidation should not be entered.

The weakness of defense arguments is the reality that additional cash advances would be required to be provided for continued operations of the Dairy. None of the

District Court Administrator
June 7, 2010
Page **3**

Defendants or proposed Intervenors has indicated willingness or an ability to provide such additional further cash advances or capital.  Further, the series of spreadsheets, exhibits and testimony provided by the Defendants in an effort to convince this Court that the Dairy could, at some future time, be operated profitably, contain misleading assumptions and details that have no historical factual basis or independent objective support.  Defendants' Exhibits G and H overstate anticipated premiums and understate current continuing and future costs and expenses that would be necessary for operations to continue.  This is further evidenced by the fact that senior lenders to Veblen East, LP have had to make protective advances of over $2.6 million since March 3, under similar market conditions as indicated by near-term futures markets contracts.  Such lenders have indicated that they refuse to continue to make protective advances. The recommendations of the Receiver are reasonable and are well-supported by evidence and arguments put forth by the Receiver both on direct and cross-examination.

For these reasons and under these circumstances, it is appropriate for entry of an order providing for liquidation.

Respectfully submitted,

Charles T. Patterson
For the Firm

CTP/clm

cc  all counsel of record

**EXHIBIT C**

**STATE OF MINNESOTA**                    **IN DISTRICT COURT**

**COUNTY OF BLUE EARTH**                  **FIFTH JUDICIAL DISTRICT**

---

AGSTAR FINANCIAL SERVICES, PCA, a          Court File No. 07-CV-10-714
federally chartered instrumentality of the        Hon. Bradley C. Walker
United States; and AGSTAR FINANCIAL
SERVICES, FLCA, a federally chartered
instrumentality of the United States,

               Plaintiffs,

v.                                                         **INTERVENORS' POST-HEARING**
                                                           **MEMORANDUM IN OPPOSITION TO**
VEBLEN EAST DAIRY LIMITED                   **RECEIVER'S RECOMMENDATION**
PARTNERSHIP, a South Dakota limited
partnership; et al.,

               Defendants,

and

AARON ANDERSON, DUAYNE
BALDWIN, JAY HILL, JORDEN HILL,
KAREN HORNSETH, JASON MEDHAUG,
RICHARD MILLNER, DENNIS PHERSON,
JR., LENNY PHERSON, MIKE STAVICK,
DAVID VIESSMAN, DOUG VIESSMAN,
RANDY VIESSMAN, TERRY VIESSMAN,
WAYNE VIESSMAN, MARK WYUM, and
MICHAEL WYUM,

               Intervenors.

---

## INTRODUCTION

The Receiver's May 3, 2010 Report (the "Receiver's Report") to the Court concludes as

follows:

> VAST recommends that an orderly liquidation of the livestock of Veblen East be
> commenced as soon as practicable, that environmental remediation be performed
> during a period of closure, and a sale of land, property and improvements follow
> thereafter [the "Recommendation"].

(Hearing Ex. 9.)  The Recommendation should be rejected.  Neither the Receiver's Report nor any other evidence introduced during the May 18 and May 27 hearing provides the necessary support for the Recommendation.  To the contrary, the record before the Court mandates a conclusion that the Receiver has not performed as required by the Court's March 3 Order.  As a result, the Receiver's Report does not provide the Court with adequate information to determine whether the Recommendation would maximize the value of Veblen East's assets or be in the best interest of all the stakeholders.

## ANALYSIS

### I.   The Role Of The Receiver Is To Preserve Assets For The Benefit Of All Stakeholders.

As a matter of law, "[t]he role of a receiver is to act as a fiduciary representing the court and all parties in interest, and the purpose and scope of a receivership is defined by court order." Equity Trust Co. Custodian FBO Eisenmenger IRA v. Cole, 766 N.W.2d 334, 341 (Minn. Ct. App. 2009) (citations omitted).  In this case, the purpose of the Receivership is to do the work necessary to make a report to the Court and the parties

> . . . with respect to options for the disposition of the Receivership Estate (to include without limitation, restructure, sale, liquidation, or such other option that will be in accordance with law and in the overall best interest of the stakeholders in the Receivership Estate).

(Order, Conclusion of Law No. 6b.)  Early in his cross examination, Mr. Weiss acknowledged that the Receiver's assignment was to conduct an analysis and make a recommendation that was in the best interest of all stakeholders.  Through the rest of his cross examination, Mr. Weiss repeatedly admitted facts demonstrating the Receiver's failure to carry out that assignment.

### II.   The Receiver Failed To Comply With The Court's March 3 Order.

To determine what the Receiver was supposed to do it is necessary to review the March 3 Order (in particular, Conclusions of Law Nos. 4 – 8 at pages 6 – 11), the separate Receiver's

2

Appointment Statement of Terms (as required by the Order at Conclusion of Law No. 4c and approved by the Court), and Minn. Gen. R. Prac. 137. Those sources describe the fundamental actions to be taken by the Receiver so the Receiver will be able to provide the Court with a well-supported recommendation, and the interested stakeholders will have the information they need to determine whether the Receiver is acting in the best interest of all stakeholders. Unfortunately, in this case, the Receiver did not perform these fundamental tasks and, as a result, the Receiver made a Recommendation that is unsupported.

The March 3 Order required the Receiver to: "forthwith submit to the Court and circulate to all parties a proposed schedule with regard to implementing" the Receiver's duties. (Order, Conclusion of Law No. 8.) No such schedule was ever proposed. Instead, the Receiver's Report was filed on May 3 without any advance notice and then dropped in the mail (in Rapid City, South Dakota) to the other parties – an approach that would provide the parties with as little notice as possible.[1]

The Receiver was also required to "cause to be prepared and file with the Court Administrator, as soon as reasonably practicable, an inventory and estimated valuation of the assets of the estate in VAST's custody." (Order, Conclusion of Law No. 4d; Minn. Gen. R. Prac. 137.03.) Despite this requirement, at the hearing on May 18, Mr. Weiss admitted that 45 days after the Receiver took control of Veblen East (and despite having been paid nearly $400,000 (see Hearing Ex. 15) the Receiver had only the most general idea of the assets owned by Veblen East and did not have any reliable information about the value of, or any claims against those

---

[1] The Receiver's desire to keep the stakeholders in the dark is also reflected in its decision to file a motion for a protective order rather than provide information requested by the Intervenors prior to the hearing. (See Receiver's Motion for Protective Order (filed on May 11, 2010).) All that was requested was information the Receiver should have compiled and relied on in making the Recommendation. (See id at Ex. 1.)

3

assets.  To date, the Receiver has still not provided any "inventory and estimated valuation of the assets of the estate."

For its services, the Receiver was to be paid $75,000 per month plus reimbursement for its reasonable expenses.  (Order, Conclusion of Law No. 4c; Statement of Terms ¶ 1a and b.) The Receiver was to report monthly to the Court regarding "its compensation and the amount of costs and expenses for which the Receiver is to receive reimbursement."  (Statement of Terms ¶ 1d.)  Any additional compensation for the Receiver required an application to the Court.  (Id. ¶ 1e.)  Likewise, to the extent the Receiver required the services of lawyers or experts, an application had to be made to the Court.  (Id. ¶ 2.)  Indeed, pursuant to Minn. R. Gen. Prac. 137.09, "Compensation of receivers and their lawyers shall be allowed **only** upon order of the court . . ."  (Emphasis added.)  At the hearing on May 18, Mr. Weiss testified that the Receiver had acted in contravention of these requirements; but with the approval of the "senior lending group."  Without notice to the Court or the parties, in early April (about a month after the Receivership was created and a month before deciding to recommend liquidation) AgStar and the Receiver agreed to increase the Receiver's compensation from $75,000 to $115,000 per month – an increase greater than 50%.  Likewise, without notice to the Court or the parties, the Receiver hired a number of "consultants" at an expense of more than $50,000 in a two month period.[2]  (See Hearing Ex. 15; Receiver's Application for Approval of Fees and Expenses (filed with the Court on June 7).)  While these violations of the Order and the Rule were not the cause of the Receiver's failure to fulfill its tasks, they are evidence of a Receiver that thought it was

---

[2] Although the Receiver's compensation and expenses have been paid by AgStar, the payment has been accomplished by means of "protective advances" for which AgStar will ultimately want to hold the borrower or the guarantors/Intervenors liable.  Despite this reality, the new compensation deal was not disclosed to anyone other than AgStar until the May 18 hearing.

4

working for AgStar rather than working for the Court to protect the interests of all of the stakeholders.

Finally, after conducting "a review of the financial and operational conditions of Veblen East" the Receiver was required to provide a report to the Court and parties

> . . . setting forth its <u>analysis</u> with respect to the current financial and operating condition of Veblen East, the short term viability forecasts and <u>options</u> of Veblen East, and an identification of assets and liabilities of Veblen East.

(Order, Conclusion of Law No. 6a (emphasis added).) The Receiver's Report of May 3 was submitted as the report required by the Order. (<u>See</u> Hearing Ex. 9 at 1.) For a number of reasons, it falls short.

To begin with the obvious, the Receiver's Report does not include an identification of the assets and liabilities of Veblen East – Mr. Weiss admitted that the Receiver has not compiled a list of the assets and liabilities.

The Receiver's Report also does not include an "analysis," at least not an analysis that is either thorough or credible. The Receiver relied on a balance sheet prepared prior to the creation of the Receivership and failed to include in the Report or to introduce at the hearing any more recent balance sheet. The Receiver reported that Veblen East is unable to pay its bills as they come due, but did not provide any analysis of why that was the case or what steps could be taken to resolve that problem, short of liquidating the assets (starting with the cows, the only assets that generate revenue). The Receiver also reported that the "senior lenders" had been making protective advances and were not going to continue. But, in his testimony, Mr. Weiss admitted the Receiver had done nothing at all to determine whether financing might be available from some other source.

Without being able to accurately identify either the assets or liabilities of Veblen East, and having done nothing to test the market for the price that might be paid in a liquidation scenario, the price that might be paid for Veblen East as a going concern, or the difference between those two prices, the Receiver's Report concludes (read "speculates") that the liquidation approach is better.[3]  The Report then goes on at length about the purported lack of cooperation from others, most notably Prairie Ridge Management and Mr. Millner, and the environmental issues that have to be addressed.  Mr. Weiss's direct examination on May 18 also focused on those issues – essentially using Mr. Millner as an excuse for the Receiver's utter failure to fulfill its duties.

But, there was much of importance that was omitted from the Receiver's Report.  For example, the Receiver's complaints about Mr. Millner and the environmental issues were countered by documentary evidence and the testimony of Mr. Millner and Mr. Stavick.  (See, e.g., Hearing Exs. C, D and E.)  Moreover, Mr. Weiss admitted that the agreement between the Receiver and the South Dakota DENR (Hearing Ex. 22) does not require or even recommend that the Veblen East operations be shut down; all of the environmental costs will be incurred whether or not the Recommendation is approved by the Court.  Mr. Weiss also admitted under cross-examination, but did not include in the Receiver's Report, the fact that the Receiver's financial projections significantly understate the volume of milk production, the price of milk and, therefore, the revenue that can be produced by Veblen East.  The Receiver's Report also failed to mention that after selling the cows, Veblen East would still have very substantial

---

[3] The Court will recall that Mr. Weiss did not remember the offer made on behalf of Mr. Millner to buy the Veblen East assets and when reminded of it (Hearing Ex. A), he admitted the Receiver had done nothing to determine whether that was an offer that should be accepted.  Similarly, Mr. Weiss admitted the Receiver had done nothing to determine whether some other buyer might exist for the Veblen East assets.  This information was omitted from the Receiver's Report.

6

expenses but would no longer have any revenue. The net effect of adopting the Recommendation would, according to the Receiver's own projections, mean even greater negative cash flow as evidenced by Hearing Ex. J (which was completely unchallenged at the hearing).

If the Receiver had complied with the Court's March 3 Order and compiled the information it was required to collect; and if the Receiver had made an unbiased, honest report and analysis of that information as required by the Order; the Receiver would have reached a different conclusion and would have made a different recommendation.

**III.     Rather Than Gather The Information Necessary To Make An Informed Recommendation, The Receiver Took Direction From AgStar.**

The Court's Order and Rule 137 required the Receiver to prepare an inventory of assets and estimate their value, and to compile information about assets and liabilities of the estate over which the Receiver was given custody so the Receiver would have the basic building blocks necessary to the analysis and recommendation that was supposed to be provided to the Court. The record before the Court makes it clear that the Receiver did not gather those basic building blocks of information before making the Recommendation.

How could the Receiver conduct the required review of the financial condition of Veblen East when it was still relying on a balance sheet that predated the Receivership, and did not have any specific information about either the assets or liabilities of Veblen East? How could the Receiver conduct an "analysis" of financial and operating conditions without a balance sheet, without an inventory of assets and liabilities, and without a cash flow projection based on accurate revenue forecasts (as distinguished from forecasts that are deliberately understated)? How could the Receiver analyze the "options" available to Veblen East without gathering data and information about financing options, potential buyers of some or all of the assets, and the

relative prices that could be obtained in liquidation vs. a going concern sale? If, as is now clear, the Receiver did not gather the information needed to make an informed recommendation, what then is the source of the Recommendation that is included in the Receiver's Report? The evidence at the hearing leads inescapably to a single conclusion: the Receiver made the Recommendation that AgStar implicitly or explicitly directed it to make.

VAST was selected by AgStar. Mr. Weiss testified that when the Receiver wanted to increase its compensation, it "negotiated" with AgStar (without bothering to inform the Court or the parties). By early April, AgStar and the Receiver had reached an agreement that increased the Receiver's compensation by more than 50%. Mr. Weiss testified that the only discussions the Receiver had with any party about the possibility of a bankruptcy filing was AgStar – AgStar was opposed to the concept and neither bankruptcy nor any other type of restructuring gets even a passing mention in the Receiver's Report (although restructuring is one of the "options" expressly mentioned in the Order). Mr. Weiss testified that he told James Park (of Hanul Professional Law Firm) that AgStar asked the Receiver to reach a recommendation to liquidate. Mr. Weiss also testified that the Receiver reached that recommendation by the end of April and then shared its draft report with AgStar (but none of the other stakeholders) before it was filed with the Court.

The Receiver's decision to work for AgStar while ignoring its responsibilities to all of the other stakeholders, is further evidenced by the remarkable statement that "the senior lenders represent the only group that has a realistic economic interest in Veblen East." (Receiver's Report at 2 (emphasis added).) Finally, to avoid the risk of opposition to AgStar's favored recommendation, the Receiver opposed intervention by other interested parties. (See Receiver's Objection to Notice of Motion and Motion to Intervene and Motion to Dismiss Complaint in

8

Intervention, dated June 7, 2010.) The evidence is clear: the Recommendation is that of AgStar, and not based on an independent analysis of relevant information.

**IV.     The Court Should Reject The Receiver's Recommendation.**

The Receiver has failed to prove that liquidation of the Veblen East herd (and the termination of all revenue) followed by environmental remediation during a period of closure and then the sale of the remaining assets would be the best course of action. AgStar's arguments that the law mandates liquidation and that the Court is bound to blindly follow the Receiver's Recommendation are just plain wrong. Rather, the Receiver's failure to carry its burden of proof means the record before the Court is insufficient to adopt the Recommendation and order liquidation of the Veblen East assets.

**A.      The Receiver Failed to Carry its Burden of Proof.**

As a matter of law, at the May 18 and 27 hearing the Receiver had the burden of proof. Cattle Owners Corp. v. Arkin, 252 F. Supp. 34, 44 (S.D. Iowa 1966); see also Ewing v. Swenson, 208 N.W. 645, 647 (Minn. 1926). It is undisputed that the Receiver's burden was to prove that the Recommendation is the course of action that maximizes the value of the Veblen East assets and best advances the interests of all stakeholders. In this case, because the Receiver failed to gather the information it was required to gather, and failed to conduct a factually supported analysis of options available to Veblen East, it necessarily failed to carry its burden of proof.

**B.      AgStar's Legal Argument does not Make Up for the Receiver's Failure.**

In apparent recognition of the Receiver's failure, AgStar argues that the Court must order liquidation as a matter of law because Veblen East is insolvent. (AgStar Letter Brief (6/7/10) at 7-8.) Notably, AgStar's argument relies exclusively on non-Minnesota law from the late 1800s

9

and early 1900s.  More importantly, the case law AgStar has cited is inapposite and AgStar's argument is contrary to common sense.

If the insolvency of an entity under receivership required liquidation, the law would provide for liquidators rather than receivers.  By definition, entities that are subject to receivership are either insolvent or likely to become insolvent.  See Minn. Stat. § 576.01.  If they were financially healthy, there would be no legal basis for appointment of a receiver.  Conversely, if insolvency meant mandatory liquidation, Rule 137 and the Court's Order would simply direct the Receiver to determine whether Veblen East is insolvent – nothing else would be needed.  In this case, without doubt, the Receiver could have determined that Veblen East is insolvent without running up a $400,000 bill for itself and another $50,000 for consultants in the first two months of the receivership.  (See Order, Finding of Fact No. 7c (finding that Veblen East was insolvent or in imminent danger of insolvency).)  Thus, it is not even necessary to understand or look at the law to know that AgStar's argument is without merit.

AgStar's argument is not only contrary to common sense, it is unsupported by the very law that AgStar cites.  AgStar relies on cases in which the receiver had no authority or duty to operate a business for the benefit of all interested parties.  For example, in Farmers' Loan & Trust Co. v. Oregon Pac. R. Co., 48 P. 706 (Or. 1897), the receiver was appointed to foreclose a mortgage.  Id. at 706.  Similarly, in Bowersock Mills & Power Co. v. Joyce, 101 F.2d 1000 (8th Cir. 1939), the receiver was ordered to dispose of the inventory of the business.  Id. at 1001.  Likewise, in Continental & Commercial Trust & Savings Bank v. Muscatine, B & S. R. Co., 210 N.W. 787 (Iowa 1926), foreclosure had been ordered and the issue was whether the receiver should continue collecting receivables and incurring expenses "without any authority from the court."  Id. at 788, 790.  The closest AgStar comes to a case that actually supports its argument is

with Merchants & Manufacturers Securities Co. v. Johnson, 98 F.2d 462 (8th Cir. 1938). In that case, the receivership order allowed, but did not obligate, the receiver to operate the business. Id. at 466. Since it was established that continuing to operate the business would necessarily dissipate or destroy the estate, the receiver was "bound . . . to discontinue operations unless otherwise specifically directed by the appointing court." Id. (emphasis added; citations omitted). Unfortunately, AgStar did not see fit to mention the all important proviso.

None of the cases cited by AgStar "mandate" that an insolvent business be liquidated, especially where, as here, the court ordered (as stipulated by the parties) that a receiver be appointed to operate the business.[4]  The Court's Order authorizes and requires the Receiver to "operate and manage Veblen East" (Order, Conclusion of Law ¶ 4e(a)) and recommend a course of action "that will be in accordance with law and in the overall best interest of the stakeholders in the Receivership Estate." (Id. ¶ 6b (emphasis added).)  The Order also makes clear that the Receiver "shall not sell substantially all of Veblen East's assets without further order of the Court or as permitted by law." (Id. at ¶ 4e(e) (emphasis added).)

Another problem with AgStar's reliance on its cases is that, in this case, the Receiver failed to prove Veblen East is hopeless.  In each of the cases AgStar cites in support of liquidating Veblen East, it was "apparent," "shown," "demonstrated" or "clear" that the business was futile and could not be conducted profitably.  See Bowersock, 101 F.2d at 1004; Merchants & Manufacturers, 98 F.2d at 466; Continental & Commercial, 210 N.W. at 789; Farmers' Loan

---

[4] Under its loan agreements with Veblen East, AgStar could have sought a judgment and pursued a foreclosure action.  For reasons it has not disclosed, AgStar chose not to.  Instead, AgStar proposed a stipulation, and the Court ordered that Veblen East continue to operate under the Receiver's control.  The Receiver is not required or even authorized to liquidate Veblen East without further order of the Court.  The cases cited by AgStar, in which foreclosure or liquidation was ordered and the receiver had no power or duty to operate the business, fall wide of the mark.

11

& Trust Co., 48 P. at 708. In other words, liquidation was the approach that best served the interests of the stakeholders in those cases. The Receiver, by contrast, has failed to establish that Veblen East has no hope of becoming profitable or that liquidation is the most appropriate remedy for all of Veblen East's stakeholders. See Cattle Owners, 252 F. Supp. at 44 (burden of proof on receiver). Cases in which liquidation was conclusively proven to be the only logical remedy are, therefore, not helpful in considering the issue before the Court.

The only case cited by AgStar that is even arguably analogous to this case is Wire Wheel Corp. of Am. v. Fayette Bank & Trust Co., 30 F.2d 318 (7th Cir. 1929). In that case, the court decided the receiver properly continued to operate a losing business because the creditors were fully informed of the business's losses and consented to an operating (rather than liquidating) receivership. Id. at 320. That is precisely what occurred here. AgStar knew Veblen East was unable to meet its obligations in March 2010, and rather than starting a foreclosure action or requesting a liquidating receivership, AgStar asked that Veblen East continue to operate. AgStar's current stance that liquidation is "mandated" contradicts the Court's Order, the purpose of this receivership, and AgStar's own stipulation.

## V.    The Record Before The Court Does Not Support Adoption Of The Recommendation.

The Court reserved to itself the right to review the Receiver's work and recommendations de novo. (Order, Conclusion of Law No. 7.) That means the Court cannot simply accept the Recommendation because it was made by the Court-appointed Receiver. Likewise, the Court cannot accept the Recommendation because Mr. Jung as "attorney for the Limited Partners of Veblen East . . . and Hanul Professional Law Corporation" filed a "Statement of Defendants"

saying that his clients "do not oppose the Report Submitted [sic] by the Receiver."[5] Rather, the Court has an obligation to make an independent determination of whether the record before it supports a conclusion that the value of the assets of Veblen East will be maximized by the staged liquidation proposed by the Receiver. See In re Telesports Productions, Inc., 476 N.W.2d 798, 800 (Minn. Ct. App. 1991) ("A receiver is a representative of the court. . . . The assets and all interests in the assets are not only in the possession of the receiver but are also in the possession and custody of the court.").

Here the record supports only a conclusion that there is a dispute about how to maximize the value of the Veblen East assets and the Receiver has failed to provide the Court with the information that would be necessary to resolve that dispute.  The Receiver having failed to carry its burden, the Court does not have a sufficient basis to adopt the Recommendation.

## CONCLUSION

The parties other than the Intervenors stipulated to the appointment of the Receiver. They stipulated to an Order that required the Receiver to operate the business while taking specific actions and gathering basic financial and operation information, culminating in a report that analyzed the options available to Veblen East.  Instead the Receiver decided to ignore the Order and the requirements of Rule 137, and make a Recommendation based not on facts but on what AgStar wanted done.  In light of all of the evidence, Intervenors respectfully submit that the Receiver's failure to meet its duties and legal obligations dooms its Recommendation to rejection.

---

[5] The Limited Partners of Veblen East and the Hanul Professional Law Corporation are not parties to this litigation and neither has sought to intervene.  The title of Mr. Jung's filing – "Statement of Defendants" – is inaccurate if not intentionally misleading.

**ANTHONY OSTLUND BAER
& LOUWAGIE P.A.**

Dated:  June 21, 2010

By: _Norman J. Baer_

Norman J. Baer (#163715)
Steven M. Pincus (#171414)
Philip J. Kaplan (#0389351)
3600 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402
(612) 349-6969

**ATTORNEYS FOR INTERVENORS**

14

## <u>AFFIDAVIT OF SERVICE BY FACSIMILE & U.S. MAIL</u>

*AgStar Financial Services, PCA, et al. v. Veblen East*
*Dairy Limited Partnership, et al. and Aaron Anderson, et al.*
*Court File No. 07-CV-10-714*

STATE OF MINNESOTA )
                    ) ss.
COUNTY OF HENNEPIN )

      Julie M. Blakeley, being first duly sworn, deposes and says that on the 21st day of June,

2010, she served the ***Intervenors' Post-Hearing Memorandum in Opposition to Receiver's***

***Recommendation*** upon:

Gary W. Koch, Esq.
Gislason & Hunter LLP
2700 South Broadway
P.O. Box 458
New Ulm, MN 56073-0458
Fax: 507-354-8447
    *Attorneys for Plaintiffs*

Robert Kugler, Esq.
Bryant D. Tchida, Esq.
Leonard, Street and Deinard
150 South Fifth Street, Suite 2300
Minneapolis, MN 55402
Fax: 612-335-1657
    *Attorneys for Defendants (not Veblen*
    *West)*

Kenneth Corey-Edstrom, Esq.
L. Kathleen Harrell-Latham, Esq.
Larkin, Hoffman, Daly & Lindgren, Ltd.
1500 Wells Fargo Plaza
7900 Xerxes Avenue South
Minneapolis, MN 55431
Fax: 952-896-3333
    *Attorneys for Defendant Veblen West*

Tom Patterson, Esq.
Patterson & Prahl, LLP
25043 Little Water Lane
Custer, SD 57730-7298
Fax: 605-673-5223
    *Attorneys for Receiver*

by faxing and mailing to them, copies thereof, at the last known fax numbers and mailing

addresses listed above.



                    Julie M. Blakeley

Subscribed and sworn to before me
this 21st day of June, 2010.

Notary Public

BARBARA K. BECKER
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2015

**EXHIBIT D**

STATE OF MINNESOTA

COUNTY OF BLUE EARTH

DISTRICT COURT

FIFTH JUDICIAL DISTRICT

---

AgStar Financial Services, PCA, a Federally chartered instrumentality of the United States; & AgStar Financial Services, FLCA, a Federally chartered instrumentality of the United States,

Plaintiffs,

vs.

Veblen East Dairy Limited Partnership, a South Dakota Limited Partnership; Veblen West LLP, a South Dakota Limited Liability Partnership; The Dairy Dozen – Milnor, LLP, d/b/a Five Star Dairy, a North Dakota Limited Liability Partnership; The Dairy Dozen – Thief River Falls, LLP, d/b/a Excel Dairy, a Minnesota Limited Liability Partnership; The Dairy Dozen – Veblen, LLP, a South Dakota Limited Liability Partnership; Prairie Ridge Management, LLC, a South Dakota Limited Liability Company; New Horizon Dairy, LLP, a Minnesota Limited Liability Partnership; Vantage Cattle Company, LLP, a South Dakota Limited Liability Partnership, d/b/a Dairy Dozen Heifers; and Shortfoot Calf Ranch, Inc., a South Dakota corporation,

Defendants.

Case Type: Other Civil

Court File No. 07-CV-10-714

Hon. Bradley C. Walker

---

## POST-HEARING BRIEF IN OPPOSITION TO RECEIVER'S RECOMMENDATION TO LIQUIDATE VEBLEN EAST'S DAIRY HERD AND OTHER ASSETS

## INTRODUCTION

Veblen East Dairy Limited Partnership's ("Veblen East") herd and other assets should not be liquidated in the fashion recommended by Value-Added Science & Technologies, LLC ("VAST"), along with its managing agent, Steven Weiss ("Weiss') (collectively "Receiver"). The Receiver's recommendation fails to maximize the value of Veblen East's assets, and this recommendation otherwise is not in the best interests of all of Veblen East's stakeholders.

The Receiver has fallen well short of its burden of proof.  The Receiver failed to provide a report to the Court and to all parties hereto setting forth its analysis with respect to the current financial and operating condition of Veblen East, the short term viability forecasts and options of Veblen East, and an identification of assets and liabilities of Veblen East.  The Receiver also failed to provide the Court with any analysis about alternatives to its recommendation, such as selling Veblen East as a going concern or filing a Chapter 11 bankruptcy, both of which are viable options, and both of which would be better options for all of Veblen East's stakeholders.

The Dairy Dozen – Veblen, LLP ("DD-Veblen"), Prairie Ridge Management, LLC ("Prairie Ridge"), New Horizon Dairy, LLP ("New Horizon"), Vantage Cattle Company, LLP ("Vantage"), and Shortfoot Calf Ranch, Inc. ("Shortfoot") (collectively "Defendants") accordingly submit this post-hearing brief in opposition to the Receiver's recommendation.

## ARGUMENT

The court requested that two issues in particular be addressed in this post-hearing submission. Those are: (1) whether Veblen East's owners have the authority to determine what should happen to Veblen East and its assets in connection with this receivership; and (2) whether milk prices can be locked in.  The Defendants will address these two issues first, followed by the remainder of the issues.

2

# I.    THE COURT MUST INDEPENDENTLY RULE ON THE RECEIVER'S RECOMMENDATION

The Court's first question is presumably directed at the filing by Veblen East's limited partners and the Hanul Professional Law Corporation of a document entitled "Statement of Defendants," in which Veblen East's limited partners and the Hanul Professional Law Corporation's attorney represents that those individuals and that law firm "do not oppose the Report Submitted by the Receiver in his capacity as Receiver for Veblen East Dairy." This statement cannot serve as the basis for the Court's ruling on the Receiver's recommendations for a variety of reasons.

First and foremost, "[t]he role of a receiver is to act as a fiduciary representing the court and <u>all parties in interest</u>, and the purpose and scope of a receivership is defined by court order." *Equity Trust Co. Custodian FBO Eisenmenger IRA v. Cole*, 766 N.W.2d 334, 341 (Minn. Ct. App. 2009) (emphasis added) (citations omitted). Because a receiver is a representative of the Court, "[t]he assets and all interests in the assets are not only in the possession of the receiver but are also in the possession and custody of the court." *In re Telesports Productions, Inc.*, 476 N.W.2d 798, 800 (Minn. Ct. App. 1991) (citations omitted).

In relevant part, this Court's March 3, 2010 Order for Receivership ("Receivership Order"), which governs the terms of this receivership, provides that:

    a.    VAST should conduct a review of the financial and operational condition of Veblen East and shall provide a report to the Court and to all parties hereto setting forth its analysis with respect to the current financial and operating condition of Veblen East, the short term viability forecasts and options of Veblen East, and an identification of assets and liabilities of Veblen East. Pending further Order of the Court, or other actions at law or in equity, title to the assets of the Receivership Estate shall remain with Defendants(s).

    b.    Upon receipt of the report, the Court shall put on its calendar a notice to all parties of a Receivership Scheduling Conference. At the conference, the parties hereto will meet and confer with respect to the report; and *with respect to*

*options for the disposition of the Receivership Estate (to include without limitation, restructure, sale, liquidation, or such other option that will be in accordance with law and in **the overall best interest of the stakeholders** in the Receivership Estate).*

c.      Subsequent to the Receivership Scheduling Conference, VAST shall submit a further report to the Court setting forth VAST's recommendations regarding the most desirable option for disposition or restructure of the Receivership Estate—together with the claims procedure (if applicable) for creditors of Veblen East.

d.      The Court shall set on for full evidentiary hearing VAST's recommendations to which the parties hereto may endorse, seek to modify, or object. ***The Court reserves to itself, subject to notice and hearing, the determination of the final form of any claims procedure and disposition or restructure of the Receivership Estate.***

Receivership Order, ¶ 6(a)-(d) (emphasis added).

Therefore, the Court reserved to itself the final determination as to whether the Receiver's recommendation is in the *overall best interests* of all of Veblen East's stakeholders. In fact, the Receivership Order provides that the Court "must decide *de novo* all objections to conclusions of law made or recommended by VAST." Receivership Order, ¶ 7 (underline added). It is the Court's independent province and duty to determine whether the Receiver's recommendation should be accepted or rejected. The Court cannot and should not delegate this responsibility to only one stakeholder, be it Veblen East's limited or general partners, or the Hanul Professional Law Corporation.

Nevertheless, the "Statement of Defendants" filed on behalf of Veblen East's limited partners and the Hanul Professional Law Corporation is not evidence in any sense of the term. It is, at best, unsworn hearsay, and, notably, it does not actually endorse the Receiver's recommendation. It says only that those individuals and that law firm purportedly do not oppose the Receiver's report. That document provides no analysis as to why the Receiver's recommendation is in the best interests of all of Veblen East's stakeholders, and that document

4

is, accordingly, of no help to the Court in making the *de novo* determination that it and it alone must make.

The purpose of the evidentiary hearing was for the Receiver to prove (it is the Receiver's burden) that its recommendation is in the best interests of all stakeholders of Veblen East. Receivership Order, ¶ 6(b); *Cattle Owners Corp. v. Arkin*, 252 F. Supp. 34, 44 (S.D. Iowa 1966) (receiver had burden of proof with respect to its report and recommendation to the court); *see also Ewing v. Swenson*, 208 N.W. 645, 647 (1926) (receiver had burden of proof in action against stockholder). The Court is obligated to make the final decision, and the Court's decision must be based upon whether the Receiver carried its burdens of proof and persuasion.

## II.    MILK PRICING

The Court is correct that milk prices can be locked in. Post-Hearing Affidavit of Richard Millner ("Millner Aff."), ¶ 2.

### A.    Classes of Milk

There are three classes of milk. Class I milk is for fluid consumption. Millner Aff., ¶ 3 Class II milk is used to produce soft products such as ice cream, cottage cheese, and yogurt. *Id.* Class III milk is used to manufacture hard products such as butter, nonfat dry milk and cheese. *Id.* All the dairies managed by PRM, including Veblen East, produce Class III milk. *Id.*

### B.    Milk Futures Pricing

Richard Millner's ("Millner") 2010 and 2011 Veblen East milk price projections presented to the Court in hearing Exhibits F and G are based upon actual Class III milk futures prices. Millner Aff., ¶ 4. Millner obtained these actual Class III milk futures prices from the following website: http://kdmtrading.com/Quotes.htm. *Id.* This website is a reliable source of Class III milk futures prices, and it is Millner's regular practice to use this website to obtain

Class III milk futures prices. *Id.* The Class III milk futures prices available at this website are taken directly from the Chicago Mercantile Exchange. *Id.* At this website, the link that says "Milk Futures – Intraday Quotes" contains the actual Class III milk future prices for the next twenty-four months. *Id.* Millner used the then-current actual Class III milk futures prices in his Veblen East 2010 and 2011 projections (hearing Exhibits F and G). *Id.*

Although Class III milk futures prices can and do vary from day-to-day, a dairy is able to lock in its milk prices for any amount of its milk, for any period within the next twenty-four months. Millner Aff., ¶ 5. This is done through a dairy broker, for example, Bongards' Creameries ("Bongards'"). *Id.* Millner has in the past used Class III milk futures prices to lock in milk prices for the dairies he manages. *Id.* Veblen East could lock in milk prices at any time with a dairy broker such as Bongards' using Class III milk futures prices. *Id.* Hearing Exhibits F and G assumed that the milk price was locked in for the balance of 2010 and all of 2011 as of the date Millner prepared those projections. *Id.*

For Class III milk, the dairy is also paid a premium based on the amount of solids contained in the milk. Millner Aff., ¶ 6. This premium varies, depending on the quality of the milk (i.e., the amount of solids in the milk – butter fat, protein and other solids). *Id.* The amount of solids present in the milk impacts the amount of cheese that can be made out of each load, so the more solids, the higher the premium. *Id.* Millner's premium projections for Veblen East are based upon actual Class III milk premiums being obtained by Veblen West and The Dairy Dozen – Milnor, d/b/a Five Star Dairy ("Five Star"), from Bongards'. *Id.* On May 20, 2010, Bongards' told Millner it would take one-hundred percent of Veblen East's milk beginning on June 15, 2010. *Id.* Veblen East could obtain the same milk premiums being obtained by Veblen West and Five Star from Bongards'. *Id.*

An example of how locking in a price based upon actual Class III milk futures would work is as follows:  if Veblen East were to lock in 100% of its milk for April 2012 at $15.50 per cwt (hundred weight), and actual prices turn out to be $12 per cwt in April 2012, then Veblen East would receive $12 per cwt from Bongards', plus its premium for solids, plus a contract settlement from its broker of $3.50 per cwt based upon its lock in at Class III milk futures prices. Millner Aff., ¶ 7.  If actual milk prices for April 2012 turned out to be higher than $15.50, then Veblen East would receive $15.50 per cwt, plus its premium for solids, and would miss out on the increased price.  *Id.*

## III. THE RECEIVER'S RECOMMENDATION SHOULD BE REJECTED

### A. The Receiver's Report, Supplement, and Testimony Lack Foundation Sufficient to Support the Recommendation

The Receiver recommends liquidation of Veblen East's revenue producing asset – its dairy herd – followed by liquidation of the rest of Veblen East's assets.  The Receiver's report, supplement and testimony, however, lack foundation sufficient to support this recommendation.

The Receiver failed to comply with even the most fundamental of its obligations.  The Receiver's paramount task was to "conduct a review of the financial and operational condition of Veblen East and . . . provide a report to the Court and to all parties hereto setting forth its analysis with respect to the current financial and operating condition of Veblen East, the short term viability forecasts and options of Veblen East, and an identification of assets and liabilities of Veblen East." Receivership Order, ¶ 6(a).

The Receiver did not comply with Paragraph 6(a).  After seventy-five days on the job and having been paid $382,000 (based on a fee agreement that was negotiated after the fact with AgStar and never presented for consideration by the court), plus another $50,000 in consulting fees (*see* Ex. 15), the Receiver filed a report and recommendation that did not include:

7

- a financial statement or balance sheet more current than 2/28/2010 (before the Receiver took the position);

- a list of assets, liabilities or claims of creditors;

- any information about the value of Veblen East's assets, liabilities or claims of creditors; or

- any foundation for its speculation that the value of a piecemeal sale of assets would be roughly the same as sale of a going concern.

Nor did the Receiver present any of this information at the evidentiary hearing. In fact, Weiss readily admits that he does not know the value of Veblen East's assets or the amount of Veblen East's liabilities. The Receiver did not even offer any evidence about the price that could be obtained for Veblen East's herd or for the rest of Veblen East's assets – either in a piecemeal sale or as a going concern.

The foundation for the Receiver's recommendations is further called into question by the admission in the Receiver's supplemental report (Exhibit 14) that some of the report "has not been thoroughly investigated or independently audited or corroborated by VAST."[1] The Receiver provided no testimony as to what portions of its report are and are not conjecture, but conjecture is not evidence, nor is it a proper basis on which to make a decision.

The Receiver's report, supplement and testimony also fail to analyze alternatives to piecemeal liquidation, such as the sale of Veblen East as a going concern, restructuring the debt in the context of this receivership, or a Chapter 11 bankruptcy. Receivership Order, ¶ 6(b).[2] There was no evidence offered by the Receiver of any action taken to find another lender or

---

[1] The Receiver admits that its other reports are, at least in part, based on conjecture as well.

[2] Although Weiss testified that he considered and rejected the possibility of a Chapter 11 bankruptcy, Weiss provided no evidence or analysis as to why or how he reached that conclusion. Ron Beach later testified that someone was opposed to recommending a Chapter 11 bankruptcy, but he would not identify this person or persons.

investor to cover any interim cash shortfalls. The Receiver utterly failed to take into account the interests of Veblen East's unsecured creditors.

The Receiver also failed to disclose an offer to purchase Veblen East as a going concern and, when confronted with this offer, Weiss claimed that he did not address it because the offer was not in writing. Weiss's testimony on this point turned out to be false, as demonstrated by Exhibit A – the written offer. The evidence in the record is undisputed that the written offer reflected in Exhibit A would yield a higher price than liquidation as proposed by the Receiver. The evidence is also undisputed that this option would be better for all of Veblen East's stakeholders.

In addition, there was no evidence offered by the Receiver of any action taken to determine whether there are any other interested buyers, much less the price and terms at which they would be interested.

Furthermore, there is undisputed evidence in the record – Exhibit J and Millner's related testimony – proving that any expenses which might be saved by liquidating Veblen East's herd are $2,128,807 less than the loss of revenue that would be caused by liquidating the herd. In other words, the Receiver's recommendation would actually result in the worst financial outcome for Veblen East's stakeholders, including AgStar.

In short, there is nothing in the Receiver's report to support its conclusion. One cannot reasonably decide that Veblen East's herd should be liquidated (thereby cutting off all revenue) without: 1) determining the base line by understanding assets, liabilities, claims and current financial condition (as was required by the Receivership Order); 2) performing an analysis of the impact of the sale of the herd; and 3) identifying and performing an analysis of all other options available. The Receiver did none of that by Weiss's own admission.

Faced with a lack of foundation and the otherwise economic irrationality of its recommendation, the Receiver resorts to name calling and speculation about, among other things, purported impending environmental disaster. Yet, Ron Beach admitted under cross examination that the South Dakota Department of Natural Resources and Environment did not order Veblen East to stop milking cows. There is absolutely no evidence in the record that Veblen East must be shut down due to environmental concerns. In fact, Millner testified that Veblen East's environmental issues can all be resolved favorably in short order by using pivots to empty its manure lagoons (just like Veblen West was successfully able to do). Moreover, as Millner testified, Veblen East's manure lagoon issues would already be resolved, were it not for the Receiver's actions (for example, filling the lagoons with sand) and inactions (for example, failing to pump the lagoons with pivots and failing to repair the sand separators).

With respect to cooperation by Millner and PRM, the Receiver's testimony is not credible. For example, Mike Stavick ("Stavick") testified that he was let go by the Receiver after he questioned the Receiver's decision to sell profitable cows and the Receiver's failure to fix the sand separators (Exhibit E). Weiss did not dispute that Stavick was told to pack up his things and was then escorted in hurried fashion from Veblen East's premises. This testimony is fundamentally inconsistent with Weiss's contention that Stavick quit.

Stavick also rebutted Weiss's contention that Millner attempted to influence employees of Veblen East to leave. To the contrary, Stavick's testimony is that Millner repeatedly told him to stay with Veblen East and to do a good job because Veblen East's survival is important to PRM and the other dairy operations it manages.

10

Nor did the Receiver's allegation that Veblen East is supporting other dairy operations prove true. Exhibits K and L, along with Millner's testimony, demonstrate conclusively that Veblen East was supported by other dairies, farmers, and vendors, not the other way around.

Nevertheless, to the extent the Receiver's personal animosity toward Millner was a "material factor underlying the recommendation to the Court," subjective retaliation is not proper foundation upon which a piecemeal liquidation recommendation should rest.

The stakes could not be higher. It is undisputed that Veblen East, Veblen West, Shortfoot and PRM employ a total of 155 employees in Veblen, South Dakota. This is very significant considering the total population of Veblen is less than 350 people. Veblen East, Veblen West, PRM and Shortfoot are the largest employers in Veblen, South Dakota. Veblen East alone employs 80 people. After Veblen East, Veblen West, PRM and Shortfoot, the next largest employer is the Bullpen, a bar and grill, that employs 9 people. The Veblen economy depends on the continued operation of Veblen East. Moreover, if Veblen East shuts down, the operations of PRM, Shortfoot, Vantage, Veblen West, Five Star and New Horizon will all be detrimentally impacted.

The Receiver failed to provide the basic foundation for his recommendation to liquidate Veblen East's herd, followed by liquidation of Veblen East's other assets. The Receiver's recommendation should be rejected for this reason alone.

### B.    The Receiver's Financial Projections are Inconsistent with the Evidence

The Receiver's financial projections for Veblen East (Exhibits 15 and 16) are fundamentally flawed and inconsistent with actual milk production and Class III milk futures pricing data. The Receiver deliberately used artificially low numbers to paint an unfavorable future financial picture for Veblen East. Weiss attempted to discount these artificially low

numbers by stating that they were just a "little low" when compared with actual numbers. As Millner testified, however, the revenue impact is millions of dollars.

Unlike the Receiver's artificially low projections for Veblen East, Millner's projections (Exhibits F and G) are based upon actual milk production data (Exhibits B and I) and actual Class III milk futures prices from the Chicago Mercantile Exchange. Based on actual data, Millner projects positive Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") of $4,087,766 for 2010 (Exhibit F) and positive EBITDA of $7,613,863 for 2011 (Exhibit G). The notion of basing projections on a magazine article rather than actual Class III milk futures prices and production data – as suggested by the Receiver – is not credible.

Tom Colquhoun ("Colquhoun"), from Stockmen's Supply, also testified that he expects milk prices to improve, that Veblen East can operate as a going concern, and that Veblen East will be able to pay all of its creditors, including its unsecured creditors.

The evidence based on actual production numbers and actual Class III milk futures prices shows that Veblen East can and will be profitable. The Receiver's recommendation should be rejected for this additional reason.

C.    <u>**The Receiver's Allegations About Herd Condition are Not Credible**</u>

Stavick's testimony regarding what Denton Blevins ("Blevins"), VAST's agent, said about the condition of the Veblen East herd is uncontested. Blevins rated the condition of the Veblen East herd at the high end of his personal scale. Stavick and Millner also testified about the excellent condition of the Veblen East herd. Veblen East's milk production numbers, which undisputedly are within the top three percent of the dairy industry, are fundamentally inconsistent with the allegation of poor herd quality.

In addition, Millner's testimony is undisputed that the Veblen East herd is special, unique, and irreplaceable. As Millner testified, this herd has been genetically developed over a period of four years to be specifically suited to Veblen East's operations. A comparable replacement herd cannot be purchased on the open market. In fact, due to the current condition of the dairy industry, the vast majority of these cows would likely be slaughtered if this herd is liquidated.

AgStar's Verified Complaint illustrates starkly the nature of the harm that would be suffered by the Defendants if Veblen East's herd is liquidated. In AgStar's own words:

> The integrated dairy production model described above demonstrates that the failure of any of the non-Borrower Dairies to continue their normal and customary business relationships with the Borrower Dairies will have an immediate and irreversible disastrous impact on the ability of either the non-Borrower Dairies (Vantage, Shortfoot, and New Horizon) or the Borrower Dairies (Veblen East, Veblen West, [Five Star] or DD-TRF), or their common management company, PRM, to continue production of milk or the flow of livestock among the entities.

Verified Complaint, ¶ 51.

Liquidating this herd makes no economic sense, and the Receiver's recommendation should be rejected for this additional reason.

## IV.    WHAT ARE THE ALTERNATIVES?

### A.    Option 1 – Sell Veblen East as a Going Concern

Several viable alternatives to the Receiver's recommendation are available to this Court. The first of these alternatives is the written offer to purchase Veblen East as a going concern (Exhibit A). Millner testified that he has backing for this offer, and that he is ready, willing and able to perform. The Receiver admits that his recommendation would yield far less than the written offer reflected in Exhibit A.

In contrast to piecemeal liquidation of the Veblen East herd and Veblen East's other assets, this alternative would allow Veblen East to pay its secured and unsecured creditors over time. This alternative would also avoid the detrimental impact on the town of Veblen, PRM, Shortfoot, Vantage, Veblen West, Five Star, and New Horizon, which would occur if Veblen East is shut down. This is a better option for all of Veblen East's stakeholders.

**B.**     **Option 2 – Chapter 11 Bankruptcy**

The next alternative is a Chapter 11 bankruptcy. Colquhoun testified that this option is most desirable from the perspective of Veblen East's unsecured creditors. As Colquhoun and Millner testified, Veblen East is a viable going concern and can be operated profitably. Allowing Veblen East to reorganize and pay its debts – to unsecured creditors and AgStar alike – over time, would be a far better option for all of Veblen East's stakeholders than piecemeal liquidation.

**C.**     **Option 3 – Order the Receiver to Solicit Proposals for a Going Concern Sale**

An additional alternative would be to order the Receiver to solicit proposals for a going concern sale and report back to the Court by a date certain.

**D.**     **Option 4 – Order the Receiver to Comply with Paragraph 6(a)**

The Court could also order the Receiver to perform its duties pursuant to Paragraph 6(a) of the Receivership Order and report back to the Court by a date certain.

**E.**     **Option 5 – Relieve VAST from its Duties and Appoint a New Receiver**

Because VAST and Weiss failed to perform their duties to provide foundation and support for their recommendation, the Court could relieve them of their duties. The Court could then appoint a new receiver to actually perform the duties required by the Receivership Order,

14

and the Court would then have the benefit of a recommendation supported by evidence and reason.

## CONCLUSION

The Receiver's recommendation to liquidate Veblen East's herd and other assets lacks foundation. The Receiver failed to comply with its basic obligations under Paragraph 6(a) of the Receivership Order. This recommendation is not in the best interests of all of Veblen East's stakeholders. Several better options exist. The Court has the duty and the authority to order any of these alternatives. It should do so to maximize the value of Veblen East in the best interests of all of Veblen East's stakeholders.

Respectfully Submitted,

LEONARD, STREET AND DEINARD, P.A.

Dated: June 7, 2010                     BY:  _____
                                             Robert T. Kugler (MN #194116)
                                             Bryant D. Tchida (MN #314298)
                                             Randy J. Zellmer (MN #123122)
                                             150 South Fifth Street, Suite 2300
                                             Minneapolis, Minnesota 55402
                                             Telephone: (612) 335-1500
                                             Fax: (612) 335-1657

                                             **ATTORNEYS FOR THE DAIRY
                                             DOZEN – VEBLEN, LLP, PRAIRIE
                                             RIDGE MANAGEMENT, LLC, NEW
                                             HORIZON DAIRY, LLP, VANTAGE
                                             CATTLE COMPANY, LLP, AND
                                             SHORTFOOT CALF RANCH, INC.**

## **ACKNOWLEDGMENT**

The undersigned acknowledges that reasonable attorney's fees, witness fees, costs, sanctions and other disbursements may be awarded to the parties against whom the allegations in this pleading are made, pursuant to Minn. Stat. § 549.211.

Bryant D. Tchida

## AFFIDAVIT OF SERVICE BY U.S. MAIL

STATE OF MINNESOTA    )
                              ) ss.
COUNTY OF HENNEPIN    )

       Janet Skjei, of the City of Minneapolis, County of Hennepin, in the State of Minnesota, being duly sworn, says that on the 7th day of June, 2010, she served:

Post-Hearing Brief in Opposition to Receiver's Recommendation to Liquidate Veblen East's Dairy Heard and Other Assets, and
Post-Hearing Affidavit of Richard Millner Regarding Milk Pricing

on the following by United States mail, by depositing a true and correct copy thereof in a sealed envelope, postage prepaid in the United States Mail at Minneapolis, Minnesota, addressed as follows:

Gary W. Koch
Gislason & Hunter LLP
2700 South Broadway
New Ulm, MN

Norman H. Baer
Anthony, Ostlund, Baer & Louwagie, P.A.
90 South Seventh Street, Suite 3600
Minneapolis, MN 55402

Charles T. Patterson
25043 Little Water Lane
Custer, SD 57730-0767

Kenneth Corey-Edstrom
Larkin, Hoffman, Daly & Lindgren
7900 Xerxes Avenue South, Suite 1500
Minneapolis, MN 55431-1194

Jeffrey T. Sveen
Siegel, Barnett & Schutz, LLP
400 Capitol Building
415 South Main Street
Aberdeen, SD 57402

_Janet Skjei_
Janet Skjei

Subscribed and sworn to before me
this 7th day of June, 2010.

_Marci A. Buchmann_
Notary Public

MARCI A. BUCHMANN
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2015

6939090v1

**EXHIBIT E**

| | |
|---|---|
| STATE OF MINNESOTA | DISTRICT COURT |
| COUNTY OF BLUE EARTH | FIFTH JUDICIAL DISTRICT |

---

AgStar Financial Services, PCA, a Federally chartered
instrumentality of the United States; & AgStar
Financial Services, FLCA, a Federally chartered
instrumentality of the United States,

                         Plaintiffs,

vs.

Veblen East Dairy Limited Partnership, a South
Dakota Limited Partnership; Veblen West LLP, a
South Dakota Limited Liability Partnership; The
Dairy Dozen – Milnor, LLP, d/b/a Five Star Dairy, a
North Dakota Limited Liability Partnership; The
Dairy Dozen – Thief River Falls, LLP, d/b/a Excel
Dairy, a Minnesota Limited Liability Partnership;
The Dairy Dozen – Veblen, LLP, a South Dakota
Limited Liability Partnership; Prairie Ridge
Management, LLC, a South Dakota Limited
Liability Company; New Horizon Dairy, LLP, a
Minnesota Limited Liability Partnership; Vantage
Cattle Company, LLP, a South Dakota Limited
Liability Partnership, d/b/a Dairy Dozen Heifers;
and Shortfoot Calf Ranch, Inc., a South Dakota
corporation,

                         Defendants.

Case Type: Other Civil

Court File No. 07-CV-10-714

Hon. Bradley C. Walker

---

## POST-HEARING AFFIDAVIT OF RICHARD MILLNER REGARDING MILK PRICING

---

| | |
|---|---|
| STATE OF SOUTH DAKOTA | ) |
| | ) s.s. |
| COUNTY OF MARSHALL | ) |

    Richard Millner, being first duly sworn on oath, deposes and states as follows:

1.      I have been in the dairy industry for more than twenty-three years, and I am familiar with how milk pricing and milk futures work.

2.      The Court is correct that dairy farmers are able to lock in milk prices.

3.      There are three classes of milk.  Class I milk is for fluid consumption.  Class II milk is used to produce soft products such as ice cream, cottage cheese, and yogurt.  Class III milk is used to manufacture hard products such as butter, nonfat dry milk and cheese.  All the dairies managed by PRM, including Veblen East, produce Class III milk.

4.      My 2010 and 2011 Veblen East milk price projections presented to the Court in hearing Exhibits F and G are based upon actual Class III milk futures prices.  I obtained these actual    Class    III    milk    futures    prices    from    the    following    website: http://kdmtrading.com/Quotes.htm.  This website is a reliable source of Class III milk futures prices, and it is my regular practice to use this website to obtain Class III milk futures prices.  The Class III milk futures prices available at this website are taken directly from the Chicago Mercantile Exchange.  At this website, the link that says "Milk Futures – Intraday Quotes" contains the actual Class III milk future prices for the next twenty-four months.  I used the then-current actual Class III milk futures prices in my Veblen East 2010 and 2011 projections (hearing Exhibits F and G).

5.      Although Class III milk futures prices can and do vary from day-to-day, a dairy is able to lock in its milk prices for any amount of its milk, for any period within the next twenty-four months.   This is done through a dairy broker, for example, Bongards' Creameries ("Bongards'").  I have in the past used Class III milk futures prices to lock in milk prices for the dairies I manage.  Veblen East could lock in milk prices at any time with a dairy broker such as Bongards' using Class III milk futures prices.  Hearing Exhibits F and G assumed that the milk

2

price was locked in for the balance of 2010 and all of 2011 as of the date I prepared those projections.

6.    For Class III milk, the dairy is also paid a premium based on the amount of solids contained in the milk.  This premium varies, depending on the quality of the milk (i.e., the amount of solids in the milk – butter fat, protein and other solids).  The amount of solids present in the milk impacts the amount of cheese that can be made out of each load, so the more solids, the higher the premium.  My premium projections for Veblen East are based upon actual Class III milk premiums being obtained by Veblen West and The Dairy Dozen – Milnor, d/b/a Five Star Dairy ("Five Star"), from Bongards'.  On May 20, 2010, Bongards' told me it would take one-hundred percent of Veblen East's milk beginning on June 15, 2010.  Veblen East could obtain the same milk premiums being obtained by Veblen West and Five Star from Bongards'.

7.    An example of how locking in a price based upon actual Class III milk futures would work is as follows:  if Veblen East were to lock in 100% of its milk for April 2012 at $15.50 per cwt (hundred weight), and actual prices turn out to be $12 per cwt in April 2012, then Veblen East would receive $12 per cwt from Bongards', plus its premium for solids, plus a contract settlement from its broker of $3.50 per cwt based upon its lock in at Class III milk futures prices.  If actual milk prices for April 2012 turned out to be higher than $15.50, then Veblen East would receive $15.50 per cwt, plus its premium for solids, and would miss out on the increased price.

Further affiant sayeth not.

_____
Richard Millner

Subscribed and sworn to before me
this _3_ day of June, 2010.

_____
Notary Public
My commission expires
30 July 2010


KAREN J. HORNSETH
NOTARY PUBLIC
SOUTH DAKOTA