## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Bankr. No. 10-10146 |
| | ) | Chapter 11 |
| VEBLEN EAST DAIRY | ) | |
| LIMITED PARTNERSHIP, | ) | |
| Tax ID No.: 20-8870979 | ) | DEBTOR'S REPLY TO HANUL |
| | ) | PROFFESSIONAL LAW CORPORATION'S |
| Debtor. | ) | JOINDER IN AGSTAR'S MOTION TO |
| | ) | EXCUSE COMPLIANCE WITH 11 U.S.C. § |
| | ) | 543 |

Veblen East Dairy Limited Partnership (the "Debtor") files this reply memorandum in response to Hanul Professional Law Corporation's ("Hanul") joinder in the motion of AgStar Financial Services, PCA and AgStar Financial Services, FLCA ("AgStar") to excuse compliance with 11 U.S.C. §543 ("Joinder").

### 1.    Background

The Debtor is a South Dakota Limited Partnership formed by the execution of that certain Veblen East Dairy Limited Partnership Limited Partnership Agreement dated January 30, 2007 ("Limited Partnership Agreement").   A true and correct copy of the Limited Partnership Agreement is attached hereto as **Exhibit A**. Debtor has one general partner, The Dairy Dozen – Veblen, LLP, a South Dakota limited liability partnership ("General Partner"). Debtor has thirty two individual limited partners who are represented by Hanul. In April of 2009, the limited partners and other interested entities made a $2,000,000 loan to the Debtor and appointed Hanul as a trustee to represent the limited partner interests in connection with the loan. Hanul required a certain Guaranty and Pledge Agreement ("Pledge") in connection with the April 2009 loan[1]. A true and correct copy of the Pledge is attached hereto as **Exhibit B**.

---

[1] It appears that proper authorization to execute the Pledge was not obtained in accordance with the General Partner's organizational documents.

Hanul's Joinder asserts that the General Partner did not have authority to commence this case because (1) Hanul had notified the Debtor and General Partner that Hanul "was taking control of all voting powers and ownership rights of the general partnership interests prior to the Petition date" and (2) that the Limited Partnership Agreement required that the General Partner obtain the limited partners prior authorization and consent to the commencement of this case. Neither basis supports the proposition that this case was not properly authorized and commenced.

2. **The Pledge Does Not Grant Hanul the Right to Vote the General Partnership Interests of the Debtor.**

The Pledge is expressly governed by South Dakota law. See Section 9(c) of the Pledge. South Dakota Stat. 48-7-702, Assignment of Partnership Interest, provides in relevant part:

> Except as provided in the partnership agreement, a partnership interest is assignable in whole or in part. An assignment of the partnership interest does not dissolve a limited partnership or entitled the assignee to become or to exercise any rights of a partner. An assignment entitles the assignee to receive, to the extent assigned, only the distribution to which the assignor would have been entitled.

The Limited Partnership Agreement expressly states that "A General Partner may not sell, assign, transfer or otherwise dispose of his Partnership Interest." See Section 7.9 of the Limited Partnership Agreement.

Under both South Dakota partnership law and the Limited Partnership Agreement, the Pledge is not enforceable. Even if the Pledge were found to be an effective transfer of an interest in the General Partner's partnership interests, by express statute the Pledge can only transfer the right to distributions and cannot grant Hanul the right to vote or "exercise any [other] rights of a partner."[2]

---

[2] If Hanul were entitled to and did exercise the rights of a general partner, it appears that the limited partners would become general partners by operation of South Dakota law and subject themselves to personal liability for partnership debts.

3. **The Limited Partnership Agreement Grants the General Partner the Authority to File the Petition Commencing this Case Without the Consent of the Limited Partners**

Section 7.1, General Authority, sets out the General Partner's authority to control the Debtor's operations. Section 7.1 states, "The General Partner shall have full, exclusive, and complete discretion in the management and control of the business and affairs of the Partnership." Furthermore, each of the limited partners appointed "the General Partner as his true and lawful attorney and agent, with full power of substitution . . . Such attorney-in-fact shall have full power and authority, in such Limited Partner's name, place and stead, to execute, acknowledge, swear to, deliver, file, and record in the appropriate public offices . . . any other instruments which may be necessary or desirable to carry out the intention of this Agreement as determined by such attorney-in-fact in its sole and absolute discretion and not in contravention of this Agreement." See Section 10.13 of the Limited Partnership Agreement.

The only provisions of the Limited Partnership Agreement which limits the General Partner's authority or require limited partner input are Sections 7.3 and 8.1. Section 7.3 of the Limited Partnership Agreement contains the only limitations on the General Partner's authority to act on behalf of the partnership. The acts limited do not include the commencement of a bankruptcy case when such act is deemed by the General Partner to be in the Debtor's best interests. Section 8.1 requires a limited partner vote in connection with certain enumerated actions which do not include the commencement of a bankruptcy case.

4.    **Conclusion.**

Based on the foregoing, the Debtor requests that the Court deny AgStar's motion and require the Receiver to complete his responsibilities under 11 U.S.C. §543(b).

/s/ Thomas M. Tobin
Thomas M. Tobin
Attorney for Debtor
404 S. Lincoln
P.O. Box 1456
Aberdeen, SD 57401
Tele: (605) 225-1000
Fax: (605) 225-0625
Email: ttobin@nvc.net

AND

Michael L. Meyer
Will R. Tansey
Attorneys for Debtor
4545 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tele: (612) 332-8511
Fax: (612) 332-8302
Email:  mlmeyer@ravichmeyer.com
           wrtansey@ravichmeyer.com

**EXHIBIT A**

This document prepared by:
**FROHLING LAW OFFICE**
Attorneys at Law
PO Box 919
Britton, SD 57430
Tel. 605-448-2273
Fax 605-448-2275

# VEBLEN EAST DAIRY LIMITED PARTNERSHIP
## LIMITED PARTNERSHIP AGREEMENT

THIS LIMITED PARTNERSHIP AGREEMENT ("the Agreement") made and entered into this _30_ day of January, 2007, by and between the General Partner(s) named in subparagraph 1.1(a) below and the Limited Partners named in subparagraph 1.1(b) below, in order to form a limited partnership known as Veblen East Dairy Limited Partnership ("the Partnership") pursuant to the South Dakota Uniform Limited Partnership Act, as amended.

WHEREAS, Congress has created an employment-based preference immigrant visa category, designated EB-5, to encourage immigration that will benefit the U.S. economy and create jobs in the United States, and

WHEREAS, Marshall and Roberts Counties in northeastern South Dakota are part of a designated regional center under the pilot program established by Congress to encourage investment in targeted employment areas, and

WHEREAS, the Limited Partners desire to invest in the Partnership in order to qualify for an EB-5 immigrant visa;

NOW, THEREFORE, in consideration of the covenants, conditions, and promises mutually undertaken to be kept and performed by the parties and set forth at length hereinafter,

IT IS HEREBY AGREED BY AND BETWEEN THE PARTIES AS FOLLOWS:

### ARTICLE 1
### DEFINITIONS

1.1     <u>Definitions</u>.   In this Agreement:

### *Parties and Financial*

(a)  "General Partner(s)" means **The Dairy Dozen—Veblen, LLP**, a South Dakota limited liability partnership, PO Box 157, Veblen, South Dakota 57270-0157, and its successors and assigns, or any Person who becomes a substitute General Partner as provided in this Agreement or any Person admitted to the Partnership as a General Partner. The Capital Contributions and Profit/Loss Percentages of the General Partner(s) are listed on **Schedule 1.1(a)** attached hereto and incorporated herein.

(b)  "Limited Partners" means, at any particular time, all of the persons who are, at such time, the Limited Partners of the Partnership.  The names and addresses of the initial Limited Partners and the Capital Contributions and Profit/Loss Percentages of the Limited Partners are listed on **Schedule 1.1(b)** attached hereto and incorporated herein.

(c)  "Partner" means a General Partner or Limited Partner of the Partnership.

(d)  "Partnership" means the limited partnership formed by this Agreement operating under the name set forth in paragraph 2.1.

(e)  "Profit/Loss Percentage(s)" means **forty-nine percent (49.00%)** collectively when referring to the General Partner(s) and **fifty-one percent (51.00%)** collectively when referring to the Limited Partners.  The Profit/Loss Percentage of each individual General Partner and Limited Partner shall be as set forth on **Schedules 1.1(a) and 1.1(b)** attached hereto and incorporated herein.

(f)  "Project" means a proposed dairy operation initially located near the City of Veblen in Marshall County in the State of South Dakota, United States of America, which plans to **employ 108 or more individuals and milk 8,300 cows**.  A summary of the anticipated funding for the Project is set forth on **Schedule 1.1(f)** attached hereto and incorporated herein.

(g)  "Restricted Term" means a period of **five (5) years**, beginning on the date of groundbreaking for construction of the dairy buildings (i.e. beginning of dirt work for building, as opposed to soil testing for permitting purposes).  During the Restricted Term, the Limited Partners relinquish certain rights and grant the General Partner certain powers as set forth in paragraph 8.5.

### General

(h)  "Act" means the Uniform Limited Partnership Act, SDCL Chapter 48-7, as amended and in effect from time to time.

(i)   "Agreement" means this Limited Partnership Agreement, as amended from time to time.

(j)   "Bankruptcy" with respect to a General Partner shall be deemed to occur when such General Partner files a petition in bankruptcy, voluntarily takes any advantage of any bankruptcy or insolvency laws, or is adjudicated a bankrupt, or, if a petition or an answer is filed proposing the adjudication of such General Partner as a bankrupt, when such General Partner consents to the filing thereof or sixty (60) days after the filing thereof unless the same shall have been discharged or denied prior thereto.

(k)   "Capital Account" means, as to any Partner, (1) such Partner's Capital Contribution, including the fair market value of any property contributed to the Partnership net of liabilities secured by such contributed property which the Partnership assumes or takes subject to, plus (2) his share of net income and gain (including income and gain exempt from tax), less (3) the amount of money distributed to him by the Partnership, the fair market value of property distributed to him by the Partnership (net of liabilities secured by such distributed property that the Partner is considered to assume or take subject to), and allocations of expenditures of the Partnership not deductible in computing its taxable income and allocations of Partnership loss and deduction. It is intended that the Capital Accounts of the Partnership be maintained in accordance with Treasury Regulations Section 1.704-1(a) and (b). To the extent that there are any other items allocated to a Partner under this Agreement, such items shall be in addition to or reduction of the Capital Account of a Partner to the extent required under Treasury Regulation Section 1.704-1(b), including Section 1.704-1(b)(2)(iv).

(l)   "Capital Contribution" means the amount contributed to the capital of the Partnership by a Partner or by his predecessor in interest.

(m)   "Capital Transaction" means a sale, exchange, or other disposition of Partnership property for value, other than in the ordinary course of the Partnership business, including an involuntary conversion by condemnation, casualty, or otherwise on which gain or loss is recognized by the Partners for federal income tax purposes, or a refinancing of Partnership property.

(n)   "Capital Transaction Proceeds" means all cash received by the Partnership from a Capital Transaction (including any interest on cash to be received) less the sum of (1) all expenses paid or incurred by the Partnership in connection with such Capital Transaction, (2) amounts applied to repayment of indebtedness, (3) capital expenditures made from the proceeds of such Capital Transaction, and (4) such additions to reserves for capital expenditures as the General Partner may determine to be necessary. All amounts released

from such capital expenditures reserves shall be deemed to be Capital Transaction Proceeds.

(o)   "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, together with Treasury Regulations issued thereunder from time to time, or any successor statute or regulations.

(p)   "Days", unless otherwise specified, means calendar days, and shall not exclude weekends or holidays.

(q)   "Entity" means any general partnership, limited partnership, corporation, limited liability company, joint venture, or association.

(r)   "Fiscal Year" means, for federal income tax purposes, a calendar year, beginning January 1st and ending December 31st.

(s)   "GAAP" means U.S. generally accepted accounting principles, as recommended in the handbook of the governing professional organization.

(t)   "Inspection Notice" means the notice described in paragraph 4.6.

(u)   "Interest" means, with respect to a Partner, such Partner's (1) Capital Account, (2) right to receive Operating Proceeds and Capital Transaction Proceeds, including proceeds of liquidation, and (3) allocable share of net income and loss of the Partnership, including gain or loss on Capital Transactions.

(v)   "Limited Partnership Unit" means the Ownership Interest of a Limited Partner in the Partnership.

(w)   "Meeting Notice" means the notice described in paragraph 6.2.

(x)   "Meeting Request" means the request described in paragraph 6.5.

(y)   "Operating Proceeds" means all cash received by the Partnership in the ordinary course of its business (exclusive of loan proceeds and Capital Contributions of the Partners) less the sum of (1) all expenses paid or incurred by the Partnership, including fees paid pursuant to the provisions of paragraph 4.8, exclusive of depreciation and other non-cash expenses and distributions to Partners, (2) amortization of principal of indebtedness (including the repayment of principal of working capital advances from the General Partner), and (3) amounts paid for capital improvements to the Project, exclusive of improvements paid from

Capital Transaction Proceeds.  Operating Proceeds shall not include Capital Transaction Proceeds nor be reduced by expenses incurred in connection with Capital Transactions.

(z)    "Option Notice" means the notice described in paragraph 9.3.

(aa)  "Ordinary Resolution" means (1) a resolution of Limited Partners approved by more than fifty percent (50%) of the Limited Partners' Ownership Interest, in person or by proxy, at a meeting of the Partners (or any adjournment thereof) called in accordance with this Agreement, or (2) a written resolution signed by Limited Partners holding more than fifty percent (50%) of the Limited Partners' Ownership Interests.

(bb)  "Ownership Interest" means, in connection with voting, one hundred percent of the ownership shares or units of the Partnership.  For example, if a seventy-five percent (75%) vote of the Ownership Interests is required on a particular subject, then Partners holding in the aggregate more than seventy-five percent (75%) of the Ownership Interest in the Partnership must vote in favor of the proposal.  Thus, if the requisite quorum percentage is sixty percent and the meeting is attended only by Partners holding sixty percent (60%) of the Ownership Interests, no decision could be made on the seventy-five percent (75%) issue because Partners holding the requisite percentage of Ownership Interest are not present.  "Limited Partners' Ownership Interests" means, in connection with voting, one hundred percent of the Limited Partners' Ownership Interests of the Partnership.

(cc)  "Partnership Property" means all property, real or personal, tangible or intangible, owned directly or beneficially by the Partnership.

(dd)  "Partnership Unit" means the Ownership Interest of the General Partner(s) or the Limited Partners in the Partnership.

(ee)  "Person" means any natural person or any Entity.

(ff)  "Quorum" means, in connection with voting, the Quorum Percentage of the ownership shares or units of the Partnership.  For example, if a majority vote of the Quorum is required on a particular subject, the Quorum Percentage is fifty percent, and the meeting is attended only by Partners holding fifty percent of the Ownership Interests, then a decision affecting the Partnership could be made by as few as slightly more than twenty-five percent (25%) of the Ownership Interests (i.e. 50.1% vote required x 50.1% quorum percentage = 25.1%).

(gg)  "Quorum Percentage" means, when referring to the requisite percentage

of Ownership Interest to hold a Partnership meeting, **more than forty-five percent (45%)** of the Ownership Interests.

      (hh)  "Refusal Notice" means the notice described in paragraph 9.2.

      (ii)  "Selling Partner" means the Limited Partner described in paragraph 9.2.

      (jj)  "Successor Entity" means an Entity described in paragraph 9.6.

      (kk)  "Tax Matters Partner" means the General Partner, who is hereby designated as the Tax Matter Partner pursuant to Code Section 6231(a)(7)A.

## ARTICLE 2
## ORGANIZATION

    2.1   <u>Formation and Name</u>.  The parties hereto hereby form a limited partnership pursuant to the Act, and the rights and liabilities of the Partners shall be as provided in the Act, except as otherwise expressly provided herein.  The name of the Partnership shall be **Veblen East Dairy Limited Partnership**" and the business of the Partnership shall be conducted under such name.  The General Partner shall promptly prepare, execute, file, and record in the appropriate public offices a Certificate of Limited Partnership and shall do all other things required for the perfection of the Partnership as a limited partnership and, if applicable, to authorize the conduct of its business under an assumed name pursuant to South Dakota law and to register to do business in South Dakota as required by South Dakota law.

    2.2   <u>Purposes</u>.  The purpose and general character of the business of the Partnership is to own and operate the Project, to hold, develop, and operate the Project as an income-producing business, and to engage in any other commercial enterprise related to the ownership, construction, or operation of the Project not prohibited to limited partnerships under the Act.

    2.3   <u>Powers</u>.  Subject to the provisions of this Agreement, the Partnership shall have the power and authority to carry out any and all purposes and activities not prohibited to limited partnerships under the Act, including, but not limited to, the following:

      (a)  To acquire, own, develop, lease, hold, and sell the Project.

      (b)  To acquire any property, real or personal, in fee or under lease, or any rights therein or appurtenant thereto, as is necessary for the operation of the Partnership

business.

(c)    To enter into, perform, and carry out contracts, agreements, commitments, financing, or borrowing arrangements of any kind necessary to accomplish the purpose of the Partnership, including without limitation, construction, management, and lease contracts, as well as contracts relating to the refinancing, sale, or other disposition of the Project and other Partnership assets.

(d)    To make any expenditures and to take any and all action and to engage in any and all activities which are incidental or reasonably related to any purposes of the Partnership, as described herein.

The Partnership shall participate in no other business unless authorized by this Agreement or in a separate writing executed by all of the Partners.  Individual Partners may, however, be involved in any and all other business ventures in which they may choose to participate other than the Project; provided that such business ventures do not compete, directly or indirectly, with the Partnership's business; provided further that the General Partner and its individual members may participate in competing businesses as set forth in paragraph 7.4(a).

2.4    Term.  The Partnership shall commence its existence upon the filing of a Certificate of Limited Partnership in the Office of the Secretary of State of the State of South Dakota.  Unless sooner terminated or dissolved pursuant to Article 9 of this Agreement, the Partnership shall continue in existence perpetually.

2.5    Property.  Title to Partnership property shall be held in the name of the Partnership or its nominee.

2.6    Address of Office and Agent.  The office of the Partnership shall be at **104 South Greenman Street, Veblen, South Dakota,** and at such other places as the General Partner may designate in writing to the Limited Partners.  In addition, the Partnership may maintain such other offices as the General Partner may deem advisable at any other place or places.  The Partnership's initial mailing address shall be **PO Box 157, Veblen, South Dakota 57270.** The registered agent of the Partnership at such address for purposes of service of process is **Richard Millner.**

### ARTICLE 3
### CAPITAL CONTRIBUTIONS

3.1    Contributions of General Partner.  The General Partner shall make an initial

capital contribution to the Partnership consisting of cash, materials, equipment, and/or other items of value as shown on Schedule 1.1(a). The General Partner shall make arrangements for the acquisition of land for the Project and for the construction and organization of the Project (with any funds expended therefore to be reimbursed by the Partnership but with no remuneration to be paid to the General Partner for his services relative to such purchase, construction, and organization).

3.2   <u>Contributions of Limited Partners</u>. Each Limited Partner shall make a capital contribution to the Partnership consisting of **Five Hundred Thousand U.S. Dollars ($500,000.00).** No Limited Partner shall be required to contribute any additional capital to the Partnership. The Capital Contribution for each Limited Partnership Unit shall be paid in cash upon admission to the Partnership. No person shall be admitted as a Limited Partner pursuant to the provisions hereof until his Capital Contribution is received in full and collected.

3.3   <u>Interest on Capital Contributions</u>. No interest shall be paid to any Partner on any amount in that Partner's Capital Account.

3.4   <u>Withdrawal or Return of Contributions</u>. A Partner may not withdraw all or any portion of his Capital Contribution. No Partner shall be entitled to any reimbursement of his Capital Contribution except as funds or other property are available for distribution pursuant to Articles 4 and 9 of this Agreement.

3.5   <u>Partnership Unit Percentages</u>. The Partnership Units shall be allocated as follows:

(a)   The General Partner shall receive **forty-nine percent (49.00%)** of the Partnership Units.

(b)   The Limited Partners shall receive **fifty-one percent (51.00%)** of the Partnership Units collectively, which amount shall be allocated pro rata among the **twenty-seven** Limited Partners. See Schedule 1.1(b).

## ARTICLE 4
## RECORDS AND FINANCES

4.1   <u>Tax Matters Partner</u>. The Tax Matters Partner shall manage administrative tax proceedings conducted at the partnership level by the Internal Revenue Service with respect to Partnership matters. Expenses of any administrative proceedings undertaken by the Tax

Matters Partner will be paid for out of Partnership assets.

4.2    Fiscal Year/Accounting Methods. For accounting and income tax purposes, the Partnership shall operate on a Fiscal Year. For accounting purposes, profit and loss of the Partnership shall be determined in accordance with GAAP and the books of the Partnership shall be kept on the accrual basis of accounting. For tax purposes, the General Partner shall determine the accounting methods to be used.

4.3    Financial Statements. At the end of each year, the General Partner shall prepare a Partnership Tax Return (IRS Form 1065) on a calendar year basis, with copies delivered to the Limited Partners within seventy-five (75) days after the end of the year or such other time as allowed by law or by an approved extension, with an applicable Schedule K-1 showing the amount of profit or loss allocated to the Limited Partner for use in preparing the Limited Partner's income tax return(s). At the end of each year, the General Partner shall prepare unaudited financial statements as of the close of each year, including, but not limited to, a statement of financial condition and a statement of profit and loss, with copies delivered to the Limited Partners no later than one hundred twenty (120) days from the end of the year.

4.4    Partnership Books. The Partnership's Certificate of Limited Partnership, this Agreement, the books and records, and meeting minutes shall be maintained at the principal place of business of the Partnership.

4.5    Confidentiality. The Partnership's books and records are confidential Partnership information. Neither a Partner nor his attorney or agent shall disclose any confidential Partnership information to anyone other than an attorney, accountant, or banker of the Partner as necessary to assist with the Partner's individual financial needs.

4.6    Inspection. Each Partner shall have access to the Partnership's books and records for inspection as provided in this paragraph. In order to minimize the disruption to business operations which inspections may cause, all inspections shall be subject to each of the following conditions:

(a)    A written notice of inspection ("Inspection Notice") shall be given to the Partnership at least ten (10) days before the desired inspection. The Inspection Notice shall state the name of the Limited Partner requesting the inspection, the desired date of inspection, the records to be inspected, including, when applicable, the beginning and ending dates, and the names of any agents or representatives authorized by the Limited Partner to view such records on his behalf, and any additional requests or information necessary to allow the Partnership to prepare for the inspection. The Inspection Notice shall comply with the notice

provisions of this Agreement, including, but not limited to, paragraph 10.10.

(b)    The General Partner shall schedule and coordinate the inspection with the Limited Partner. If business or workload conditions so require or if voluminous records are to be inspected, the General Partner may postpone the inspection for up to twenty (20) additional days.

(c)    An inspection may not unreasonably interfere with normal business operations, shall occur during normal business hours, and shall occur at the principal place of business of the Partnership or such other convenient place designated by the General Partner.

(d)    The cost of an inspection shall be at the Limited Partner's sole expense. The cost of an inspection shall include, but not be limited to, reasonable labor charges for the time of Partnership employees and agents in assembling or providing records for inspection, and the Partnership's out-of-pocket costs for providing such records, such as copying or printing expenses. The General Partner may require the Limited Partner to pay the estimated costs of the inspection in advance.

4.7    <u>Expenses of Partnership</u>. The General Partner shall cause the Partnership to pay all reasonable expenses relating to the organization of the Partnership, the syndication of limited partnership interests, and the financing and construction of the Project, including, but not necessarily limited to, travel expenses, legal and accounting fees, and filing and recording fees. The Partnership shall pay all of its own expenses, including legal, accounting, and other professional fees and expenses. The General Partner shall be entitled to reimbursement for reasonable out-of-pocket expenses, including travel expenses incurred in connection with the business of the Partnership.

4.8    <u>Compensation to General Partner</u>. Other than allocations of the profits, gains, losses, or distributions of cash to be made to the General Partner pursuant to this Agreement and the reimbursement of expenses, the General Partner shall not be paid any additional compensation or remuneration; however, the individual members of the General Partner shall be compensated for services rendered to the Partnership as determined by the Partners at a meeting of the Partnership.

## ARTICLE 5
## ALLOCATIONS AND DISTRIBUTIONS

5.1    <u>Determination of Net Income or Loss</u>. The net income or loss of the Partnership for each Fiscal Year shall be determined by the General Partner in accordance with GAAP.

5.2    <u>Allocations</u>. Net proceeds realized from the sale of assets and profits or losses realized from Project shall be allocated in accordance with the Profit/Loss Percentages, unless the Partners adopt different treatments of particular items. The income or loss of the Partnership for tax purposes for the Fiscal Year shall be allocated to the Partners in accordance with the Profit/Loss Percentages. The interest of the Partnership shall be allocated to the Partners in accordance with the Profit/Loss Percentages.

5.3    <u>Distributions</u>. The amounts of any cash distributions from Operating Proceeds, after repayments, if any, of loans from the General Partner, shall be allocated in accordance with the Profit/Loss Percentages. The amount of any cash distributions from Capital Transaction Proceeds, other than distributions and final liquidation of the Partnership pursuant to paragraph 9.8 hereof, shall be allocated accordance with the Profit/Loss Percentages.

5.4    <u>Other Distributions</u>.  Cash may be paid to the General Partner for reimbursement of expenses or fees credited to the General Partner in accordance with the provisions of paragraph 4.8 without regard to whether any other cash distributions are then being made. No cash shall be distributed to any Partner if such distribution (a) is not permitted, or would constitute or result in a default, under any loan or other agreement to which the Partnership is a party or by which it or any of its properties is bound, (b) would constitute a fraudulent conveyance as against creditors of the Partnership, or (c) would not be in the best interests of the Partnership (as determined by the General Partner, in his discretion, acting in good faith). The General Partner shall nevertheless endeavor, to the maximum extent practicable, to distribute cash to the Partners in order to enable the Partners to pay any federal income tax liability accruing to them as a result of their respective Partnership Interests.

5.5    <u>Effective Date</u>. All of the provisions of this Article relating to allocations and distributions shall be effective upon the admission of the first Limited Partner pursuant to paragraph 3.2.

5.6    <u>Partner's Tax Returns</u>. Each Partner shall prepare and file such documents as may be required to be prepared and filed under any applicable tax law and other similar legislation to which the Partner may be subject. Each Partner shall include in such Partner's computation of income the income or loss of the Partnership for tax purposes as may be determined and allocated to him pursuant to this Agreement.

**ARTICLE 6**
**MEETINGS**

6.1     Subject Matter.  Partnership meetings may be held regarding any subject upon which Limited Partners are authorized to vote as set forth herein, provided that any decisions may not in any manner contravene or modify the rights of the General Partner to conduct the Partnership's business as provided in this Agreement, including, but not limited to, Article 7 and paragraph 8.5.

6.2     Notice (Timing).  A notice of meeting ("Meeting Notice") shall be mailed to each Partner not less than twenty-one (21) nor more than fifty (50) days before the date of each meeting of the Partners.  The Meeting Notice shall comply with the notice provisions of this Agreement, including, but not limited to, paragraph 10.10.

6.3     Notice (Contents).  A Meeting Notice shall state the date, time, and place of the meeting, a list of the topics to be discussed and decided, provide sufficient information about each topic to enable each Partner to make a reasoned investigation and judgment on each topic to be considered and decided at the meeting, and, if the meeting is called by the General Partner and the General Partner has formed an opinion regarding such topic, state the General Partner's recommendation regarding the topic.

6.4     Place of Meetings.  A Meeting of the Partners shall be held at a location in South Dakota that is selected by the person that called the meeting.

6.5     Call.  Meetings may be called by the General Partner or the Limited Partners in accordance with the following provisions:

        (a)     Optional.  The General Partner may at any time and from time to time call a meeting of the Partners for the purpose of considering any business set forth in the Meeting Notice.

        (b)     Mandatory.  The General Partner shall call a meeting of the Partners within twenty (20) days following receipt of a request for a meeting of the Partners ("Meeting Request") if the Meeting Request (1) is made by Limited Partners holding in the aggregate not less than twenty-six percent (26%) of the issued and outstanding Partnership Units, and (2) contains sufficient detail of the business to be considered at the meeting to permit the General Partner to distribute a Meeting Notice with the required content.  If the General Partner fails to call the meeting of Partners within twenty (20) days of receipt of a sufficient Meeting Request, then the Limited Partners who signed the Meeting Request may mail the Meeting Notice.

6.6     Quorum.  Partners holding the Quorum Percentage of the Partnership Units,

present in person or by proxy, shall constitute a quorum for the transaction of any business at a meeting of the Partners. If a quorum is not formed within sixty (60) minutes of the date and time the meeting was to commence, the meeting shall be adjourned for lack of quorum.

6.7    Proxies. Each person entitled to vote at a meeting of the Partners may vote by proxy, provided that the proxy is received by the General Partner at least three (3) days before the commencement of the applicable meeting to allow time for verification of the proxy and is in a form acceptable to the General Partner or the chairman of the meeting, both acting reasonably. Any individual may be appointed as a proxy-holder, whether or not such individual is a Partner.

6.8    Procedure. To the extent that the rules and procedures for the conduct of a meeting of the Partners are not prescribed in this Agreement, such rules and procedures shall be determined by the chairman of the meeting, acting reasonably.

6.9    Conduct and Decisions. The General Partner shall appoint the chairman of the meeting. Except as otherwise expressly provided herein to the contrary, on each question submitted to a meeting of Partners for decision, each Partner shall be entitled to one vote or fraction thereof for each Profit/Loss Percentage such Partner holds and decisions shall require the affirmative vote of a **majority of the Quorum** (as opposed to a majority of the Ownership Interests) present in person or by proxy.

6.10    Effect of Resolutions. A resolution approved or consented to in accordance with this Agreement shall be binding upon each of the Partners and their respective heirs, executors, administrators, successors, and permitted assigns.

6.11    Minutes. The proceedings of a meeting of the Partners shall be recorded by the General Partner in a minute book, which shall be kept as part of the Partnership records.

6.12    Resolution in Lieu of Meeting. In lieu of an actual meeting, the Partnership may act by a resolution signed by Partners holding the requisite percentage of Partnership Units necessary to decide a particular issue. Such resolution is as valid and effective as if it had been passed at a meeting of the Partners called in accordance with this Agreement.

## ARTICLE 7
## GENERAL PARTNER(S)

7.1    General Authority. The General Partner shall have full, exclusive, and complete discretion in the management and control of the business and affairs of the Partnership. The

General Partner shall have the powers and rights expressly granted in this Agreement. The General Partner shall also have all the powers and rights of a general partner of a limited partnership organized under the Act, unless such discretion, powers, or rights are expressly limited or denied in this Agreement. Actions on behalf of the General Partner shall be evidenced by the signature of the General Partner or his designee.

7.2    <u>Specific Authority</u>. Without limiting the generality of the powers granted in paragraph 7.1, in connection with managing and controlling the business and affairs of the Partnership, the General Partner shall have authority on behalf of the Partnership and without limitation:

(a)    To purchase liability and other insurance to protect the Partnership's assets and business operations, and to determine whether and to what extent to insure against risks customarily insured against in the Partnership's business and whether or not the Partnership shall be partially or wholly self-insured with respect to such risks.

(b)    To enter into, execute, and carry out contracts and agreements customarily employed by the Partnership's business, and to execute any and all documents reasonably required to finance, construct, and operate the Project.

(c)    To execute notes and mortgages in order to secure any Project loan and to execute any loan agreement and other documents required by a lender; provided that nothing herein shall be construed either as creating any personal liability to any Partner or as resulting in any personal liability of any Limited Partner in excess of his Capital Contribution.

(d)    To construct the Project and any other necessary structures pertinent thereto, to acquire the real estate upon which the Project is to be constructed by purchase, lease, gift, devise, or otherwise, to obtain all necessary licenses and permits required by any governmental authority for the construction, maintenance, and operation of the Project, and to execute any and all documents reasonably required to finance, construct, and operate the Project.

(e)    To sell, lease, assign, convey, or otherwise transfer title to any portion of the Partnership's real and personal property, including any interest in any mortgage (including for the purposes of this Agreement deeds of trust, security agreements, and financing statements).

(f)    To loan money to the Partnership and charge interest thereon, to borrow money or otherwise obtain financing from any source for Partnership purposes, including

financing for a term of years which may exceed the life of the Partnership, to pledge, mortgage, grant security interests in, or otherwise encumber all or any part of the assets (including undistributed income) of the Partnership as security for such borrowings or financing arrangements, and to guarantee, on behalf of the Partnership, the repayment of such borrowings.

(g)    To admit at any time any assignee as a substitute or additional Partner in accordance of the provisions of this Agreement.

(h)    To hire, employ, retain, or otherwise secure employees, attorneys, accountants, and other independent contractors or personnel necessary or appropriate to carry out the purposes of the Partnership upon such terms as the General Partner may determine.

(i)    To sue and be sued, and complain and defend, in the name of and on behalf of the Partnership, and to settle, adjust, submit to arbitration, and compromise all actions, suits, accounts, claims, and demands whatsoever, now or hereafter pending, between the Partnership and any other party (other than a General Partner).

(j)    To pay out of Partnership funds any and all Partnership costs and expenses.

(k)    To issue cash distributions to the Partners pursuant to Article 5.

(l)    To make or revoke such elections as the General Partner may deem appropriate under the tax laws of the United States and the State of South Dakota as to the treatment of items of Partnership income, gain, loss, deduction, and credit. Without limiting the generality of the foregoing, the General Partner in his sole discretion may cause the Partnership to make or revoke the election referred to in Section 754 of the Code (relative to optional adjustment to basis of partnership property) and to make and revoke elections on behalf of the Partnership and the Partners as the General Partner deems to be in the best interests of the Limited Partners and in the spirit of this Agreement.

(m)    To take all other actions, to enter into all other agreements and transactions with any other parties [including, within the limitations of subparagraph 7.2(n), the General Partner, regardless of whether the General Partner shall profit therefrom], and to execute all other documents and instruments of any kind which the General Partner may deem necessary or appropriate in carrying out the purposes of the Partnership.

(n)    To delegate all or any of his powers, rights, and obligations hereunder, and

in furtherance of any such delegation, to elect, employ, contract, or deal with any person for the transaction of the business of the Partnership, which persons may, under the supervision of the General Partner, perform any acts or services for the Partnership as the General Partner may approve, provided that the General Partner shall continue to be primarily responsible for the performance of all such obligations. The expenses arising out of such delegation, including salaries and wages, shall be the direct expenses of the Partnership.

(o)   To enter into contracts on behalf of the Partnership with the General Partner or with persons affiliated with the General Partner, provided that any such contract shall be on terms and conditions which the General Partner believes to be as favorable to the Partnership as could be obtained from unaffiliated parties.

(p)   To amend this Agreement or the Certificate of Limited Partnership as provided in paragraph 10.2.

(q)   To raise capital by issuing Partnership Units.

7.3   Limitations On Authority. In addition to the other acts expressly prohibited by this Agreement or by law, the General Partner shall not have authority to:

(a)   Do any act in contravention of this Agreement, any loan agreement, or any other agreement by which the Partnership is bound.

(b)   Do any act which makes it impossible to carry on the ordinary business of the Partnership.

(c)   Confess a judgment against the Partnership.

(d)   Possess Partnership property or assign the rights of the Partnership in specific property for other than a Partnership purpose.

(e)   Admit a person as a Partner except as otherwise provided in this Agreement or in any loan agreement.

7.4   Specific Obligations. Without compensation other than as provided herein, the General Partner shall:

(a)   Use his best efforts to manage the business and affairs of the Partnership and devote such part of his time as may be reasonably necessary to manage the operations of

the Partnership as contemplated under this Agreement. The General Partner may engage in other businesses, for his own account or otherwise, which are the same as or similar to the business of the Partnership, irrespective of whether such businesses shall be competitive with the Partnership. Neither this Agreement nor any activity undertaken pursuant hereto shall prevent the General Partner from acting as aforesaid or require the General Partner to permit the Partnership or any Limited Partner to participate in any such business. It is understood and agreed that the General Partner, and/or its individual partners and investors, currently have significant investments in several other dairy operations, and it is further understood and agreed that both their dairy experience and expertise and the benefits derived from the economies of scale gained by having one management group for several dairies are material reasons for the Limited Partners involvement in this Project. Thus, as a material part of the consideration for the General Partner's execution hereof, all Limited Partners hereby authorize the General Partner to engage in any such other business.

(b)   Use his best efforts, upon commencement of full milking operations, to create and maintain minimum of one hundred eight (108) new employees on a full-time basis (based on 35 hours worked per week) who are either lawful permanent residents or citizens of the United States as proven by appropriate documentation (including but are not limited to US immigration form I-9). The General Partner may, at the expense of the Partnership, consult legal counsel in performing the duties specified in this subparagraph.

(c)   Maintain Partnership records and books of account in which shall be entered fully and accurately all transactions and other matters relative to the Partnership business as are usually entered in records maintained by persons engaged in business of a like character.

(d)   Maintain adequate records and accounts of all Partnership operations and expenditures and furnish the Limited Partners with the financial and tax information required by paragraph 4.3.

(e)   Make available to any Limited Partner as soon as practicable following his written request a list of the names and addresses of all Limited Partners showing the interest of each Limited Partner in the Partnership.

(f)   Make available for inspection by any Limited Partner or his duly designated agents all books and records of the Partnership required to be maintained pursuant to Article 4 of this Agreement.

7.5   **Inquiry As To Authority.**   No person or entity dealing with the Partnership shall

be required to inquire as to the authority of the General Partner to take any action or make any decision on behalf of the Partnership. As between the Partnership and a lender, it shall be conclusively presumed that the proceeds of a loan or other credit arrangement are to be and will be used exclusively for the purposes authorized under this Agreement, and no such person or entity shall be required to inquire as to the purposes for which such loan or other credit arrangement is sought.

7.6    Liability For Certain Acts or Omissions. The General Partner shall not be liable to the Limited Partners for any act or omission which causes or results in loss or damage to the Partnership if the General Partner determined in good faith that such act or omission was in the best interests of the Partnership. The General Partner shall be liable to the Limited Partners for any act or omission which causes or results in loss or damage to the Partnership if such act or omission constitutes gross negligence.

7.7    Indemnification. The Partnership shall indemnify any person, including the General Partner, who was, is, or is threatened to be made, a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative (including any action by or on behalf of the Partnership) by reason of any acts, omissions, or alleged acts or omissions of such person in connection with the Partnership, against expenses for which such person has not otherwise been reimbursed (including attorneys' fees, judgments, fines, and amounts paid in settlement), without payment being made by the General Partner, so long as such act or omission was not done fraudulently or in bad faith, a result of gross negligence, or, with respect to any criminal action or proceeding, done by such person when such person had reasonable cause to believe his conduct was not unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent shall not of itself create a presumption that the act or omission was done fraudulently or in bad faith, a result of gross negligence, or, with respect to any criminal action or proceeding, done by such person when such person had reasonable cause to believe that his conduct was unlawful.

7.8    General Partner as Limited Partner. The General Partner may invest in the Partnership as a Limited Partner and, to the extent of his interest as a Limited Partner, shall acquire the same rights and obligation as the other Limited Partners.

7.9    Assignment. A General Partner may not sell, assign, transfer, or otherwise dispose of his Partnership Interest.

7.10    Withdrawal. A General Partner may not voluntarily withdraw from the Partnership without an Ordinary Resolution of the Limited Partners consenting to such

withdrawal and without the prior written consent of a lender, if required by the loan documents.

     (a)  <u>Replacement</u>.  If a General Partner withdraws, the business of the Partnership shall continue and **twenty-six percent (26%)** of the Limited Partners by Ownership Interest may call a special meeting of the Partnership for the purpose of replacing the withdrawn General Partner. At least ten (10) days' written notice of such meeting shall be given to all Partners. At such meeting a General Partner may be replaced.  Immediately upon his admission as a General Partner, a substitute General Partner shall become the owner of the Partnership Interest of the withdrawn General Partner.

     (b)  <u>Failure to Admit Substitute General Partner</u>.  If the withdrawn General Partner is the sole General Partner of the Partnership and a substitute General Partner is not appointed and admitted within a reasonable time after the special meeting, then the Partnership shall be dissolved and terminated as of such date and the Partnership shall wind up its business.

     (c)  <u>Payment</u>. The withdrawn General Partner shall be entitled to payment for his Ownership Interest in the Partnership.  The purchase price shall be determined in accordance with the provisions of paragraph 9.4. The substitute General Partner, the Limited Partners, and the Partnership shall be jointly and severally liable to the withdrawn General Partner for such amount.

    7.11  <u>Compensation</u>.  A General Partner shall not be entitled to a fee for acting as a General Partner, except those fees and moneys to be paid pursuant to paragraph 4.8.

## ARTICLE 8
## LIMITED PARTNERS

    8.1  <u>Policy Decisions</u>.  Notwithstanding the powers and authority granted to the General Partner in paragraphs 7.1 and 7.2, the Limited Partners shall have the right, together with the General Partner, to vote on the following policy matters affecting the Partnership:

     (a)  The merger or consolidation of the Partnership with another Entity or the exchange of interests in the Partnership for interests in other Entities.

     (b)  The sale, lease, exchange, or other disposition of all or substantially all of the assets of the Partnership.

(c)    The voluntary dissolution of the Partnership.

(d)    Any other matters set forth in this Agreement where the Limited Partners have the right to vote.

(e)    Any matter referred to a vote by the General Partner.

Policy decisions shall be made and decided as provided in paragraph 6.9.

8.2    <u>General Rights, Oligations, and Liability</u>.  Notwithstanding any other provision of this Agreement, no Limited Partner shall be personally liable for any of the debts of the Partnership or any of its obligations, no Limited Partner shall take part in the management of the Partnership or transact any business for the Partnership (except for policy matters as provided herein, as the General Partner shall be responsible for the day-to-day management of the Partnership as set forth in Article 7 of this Agreement), and no Limited Partner may sign for or bind the Partnership.  However, nothing herein contained shall prevent the Partnership from employing a Limited Partner to render services to or for the Partnership.

8.3    <u>Assignment</u>.  Except as otherwise specifically permitted by subparagraph 8.3(e) in the case of death, bankruptcy, or incompetency, no assignment by a Limited Partner of his interest in the Partnership, whether or not for value, by operation of law, or otherwise, shall be effective unless all of the conditions of subparagraph 8.3(a) are met.

(a)    <u>Requirements</u>.  An assignment must meet all of the following conditions: (1) such assignment shall be in such form as shall be satisfactory to the General Partner and his counsel; (2) the General Partner shall have consented in writing to such assignment, which consent may not be unreasonably withheld; (3) such assignment shall not result in the termination of the Partnership under Section 708 of the Code; (4) the Partnership shall have received an opinion of counsel, satisfactory to the General Partner, that the proposed assignment is permissible under the Securities Act of 1933, as amended, the rules and regulations of the Securities and Exchange Commission thereunder, and applicable South Dakota law, does not adversely affect the tax status of the Partnership, and would not violate this Agreement and any loan agreements; and (5) the assignor and assignee and, if deemed necessary by the General Partner, all Limited Partners, shall have executed all such certificates and other documents and performed all such acts as the General Partner deems necessary or appropriate to effect a valid transfer and to preserve the rights, status, and existence of the Partnership.

(b)    <u>Effective Date</u>.  Except as otherwise specifically provided by subparagraph

8.3(e), the effective date of any assignment, whether or not for value, by operation of law, or otherwise, shall be the first day of the month next following the date on which an assignment in the required form has been duly executed by the assignor and assignee and all other conditions set forth in or contemplated by subparagraph 8.3(a) have been complied with to the satisfaction of the General Partner and his counsel; provided, however, that if such date shall fall on the first day of a month such date shall be the effective date of the assignment.

(c)      Payment of Distribution.  The Partnership shall, after the effective date of any assignment pursuant to the provisions of this paragraph 8.3, pay all distributions on account of the interest so assigned to the assignee.

(d)      Continuing Obligation.  Any Limited Partner who assigns his entire interest in the Partnership shall, upon the effective date of such assignment, cease to be a Limited Partner for all purposes, except that no assignment of all or any portion of his interest in the Partnership shall relieve the assignor of his obligations under this Agreement whether arising before or after such assignment.

(e)      Death, Bankruptcy, or Incompetency.  If a Limited Partner dies or is adjudged bankrupt or incompetent, then his duly appointed and qualified legal representative shall succeed to the Interest of such Limited Partner upon furnishing to the General Partner evidence, satisfactory to the General Partner and his counsel, of such representative's appointment and authority. Such legal representative may further assign the Interest of such deceased, bankrupt, or incompetent Limited Partner only as permitted by this paragraph 8.3. The provisions of this subparagraph (e) shall apply to any assignment or distribution by any legal representative to the devisees or heirs of any deceased Limited Partner.  The death, bankruptcy, or adjudication of incompetency of a Limited Partner shall not cause the termination or dissolution of the Partnership and the business of the Partnership shall continue.

(f)      Substitute Limited Partners.  No assignee shall have the right to become a substitute or additional Limited Partner unless the General Partner consents in a writing duly executed and filed in the appropriate public offices and unless the assignee has paid to the Partnership the estimated costs and expenses (including attorneys fees and filing costs) incurred in effecting the substitution or addition.  Such substitute or additional Limited Partner shall reimburse the Partnership for any amount by which the actual costs and expenses exceed the amount of such estimate.  If the estimated costs and expenses initially paid shall exceed the actual costs and expenses so incurred, such excess shall be refunded to such substitute or additional Limited Partner.  By execution of this Agreement or a counterpart hereof, or by authorizing such execution on his behalf, each Limited Partner consents and

agrees that any assignee may be admitted as a substitute or additional Limited Partner by the General Partner through the exercise of the Power of Attorney granted under paragraph 10.13, without the necessity of any further action by, or consent of, the Limited Partners.

8.4 <u>Withdrawal Prohibited</u>. A Limited Partner may not withdraw or sell his Limited Partnership Units during the Restricted Term. After the Restricted Term, a Limited Partner may convey, assign, or transfer his Limited Partnership Units subject to the right of first refusal and option set forth in paragraphs 9.2 and 9.3.

8.5 <u>Restricted Term</u>. All Limited Partners agree and grant the General Partner the irrevocable right to operate Partnership in accordance with the provisions of this Agreement in general, and Article 7 in particular, during the Restricted Term. All Limited Partners further irrevocably agree that no Limited Partner(s) individually, or all Limited Partners collectively, may sell, dissolve, terminate, or alter the operation of the Partnership without the written consent of the General Partner and all Limited Partners during the Restricted Term. If the General Partner fails to use his best efforts as required by subparagraph 7.4(b), then the Limited Partners may, by a resolution approved by seventy-five percent (75%) of the Limited Partners' Ownership Interests at a properly called meeting, revoke all or any portion of the exclusive authority granted to the General Partner pursuant to this paragraph 8.5. After the Restricted Term ends, following the procedures set forth in Article 6 of this Agreement, the Partners may, by a majority vote of the Ownership Interests, modify the rights of the General Partner as otherwise set forth herein; provided that such changes in the powers or authority of the General Partner shall trigger the option set forth in paragraph 9.3.

8.6 <u>Certificates For Partnership Units</u>. Certificates representing Limited Partnership Units of the Partnership shall be issued by the Partnership.

(a) <u>Form and Records</u>. The certificates shall be in such form as shall be determined by the General Partner. All certificates for Limited Partnership Units shall be consecutively numbered or otherwise identified. The name and address of the Person to whom the certificate has been issued shall be entered on the transfer books of the Partnership. The Person in whose name the Certificate stands on the books of the Partnership shall be deemed by the Partnership to be the owner thereof for all purposes.

(b) <u>Transfer</u>. Transfer of certificates of the Partnership pursuant to this Agreement shall be made only on the transfer books of the Partnership by the holder of record thereof or by the holder's legal representative, who shall furnish proper evidence of authority to transfer and surrender the certificate for cancellation. All certificates surrendered to the Partnership for transfer shall be canceled. No new certificates shall be issued until the former

certificate has been surrendered and canceled.

(c)   <u>Loss or Destruction</u>.  In case of loss or destruction of any certificate, another certificate may be issued in its place upon proof of such loss or destruction, and upon giving a satisfactory bond of indemnity to the Partnership and to the transfer agent and registrar, if any, of such certificate, in such sum as the General Partner may determine.

(d)   <u>Regulations</u>.  The General Partner may make such further rules and regulations not inconsistent with the laws of the State of South Dakota as it may deem expedient concerning the issue, transfer, restriction, conversion, and registration of certificates of the Partnership, including the appointment or designation of a transfer agent and the establishment of fees for the transfer, cancellation, issuance, or replacement of certificates. The Partnership may act as its own transfer agent and registrar.

## ARTICLE 9
## EXPULSION, SALE, TERMINATION, AND DISSOLUTION

9.1   <u>Expulsion</u>.  A Limited Partner may be expelled from the Partnership upon the affirmative vote of those Partners (General and/or Limited) holding more than ninety percent (90%) of the Profit/Loss Percentage of the Partnership, exclusive of the Profit/Loss Percentage of the expelled Limited Partner. For example, if Limited Partner A holds fifteen percent (15%) of the Profit/Loss Percentage of the Partnership, an affirmative vote of the Partners holding ninety percent (90%) of the remaining eighty-five percent (85%) of the Profit/Loss Percentage of the Partnership [seventy-six and 5/10ths percent (76.5%) of the total Profit/Loss Percentage] shall result in the expulsion of Partner A. The Partnership shall pay the expelled Limited Partner for such Partner's interest in accordance with paragraph 9.4. Grounds for expulsion include, without limitation:

(a)   Repeated and excessive requests for information which require significant amounts of management's time and thus detract from management's ability to oversee day-today activities and make management decisions and long-term plans.

(b)   Any other activities which, in the sole opinion of the other Partners, are detrimental to the Partnership.

9.2   <u>Right of First Refusal</u>. The Partnership Interest of a Limited Partner is subject to a right of first refusal in favor of the General Partner as follows:

(a)   <u>Refusal Notice</u>.  If a Limited Partner ("<u>the Selling Partner</u>") desires to sell,

transfer, or otherwise dispose of any of his Partnership Units to another Limited Partner or a third party, he shall first give written notice ("the Refusal Notice") of his intentions to the General Partner.  The Refusal Notice shall (1) refer to this paragraph 9.2, (2) identify the proposed buyer, (3) set forth the price, terms, and conditions of the proposed sale, and (4) include a written copy of the bona fide offer to purchase signed by the proposed buyer.

(b)   Right to Purchase.  The General Partner shall have the right to purchase all of the Partnership Units of the Selling Partner at the same price and upon the same terms and conditions specified in the Refusal Notice.

(c)   Exercise or Non-Exercise of Right.  The General Partner shall have sixty (60) days following receipt of the Refusal Notice to exercise his right to purchase the Selling Partner's Partnership Units.

(1)   If the General Partner exercises his right to purchase, the closing of such transaction shall take place at the Partnership's principal office not later than one hundred twenty (120) days after the General Partner's receipt of the Refusal Notice.

(2)   If the General Partner does not timely exercise his right to purchase all of the Selling Partner's Partnership Units, or if the General Partner timely exercises his right to purchase but thereafter fails to timely close (with such failure being solely attributable to the General Partner's failure to perform), then the Selling Partner may sell all, but not less than all, of his Partnership Units to the proposed buyer within a thirty (30) day period following the expiration of such one hundred twenty (120) day period, but only at the price and upon the terms and conditions specified in the Refusal Notice.

(3)   If the Selling Partner does not close on the sale of all his Partnership Units to the proposed buyer within such thirty (30) day period, the provisions of this paragraph 9.2 shall continue to apply to any subsequent contemplated sales of Partnership Units by the Selling Partner to a proposed buyer.

9.3   Option.  At any time within thirty (30) days after an affirmative vote to modify the rights of the General Partner set forth in paragraph 8.5, the General Partner shall have the option to purchase all (but not less than all) of the Limited Partnership Units of the Limited Partners by giving written notice ("the Option Notice") to the Limited Partners.  The Option Notice shall comply with the notice provisions of this Agreement, including, but not limited to, paragraph 10.10.  The purchase price and terms shall be determined in accordance with the provisions of paragraph 9.4.

9.4    Purchase Price and Terms.  When the determination of the purchase price of a Partnership Unit refers to this paragraph 9.4, the purchase price and terms shall be as determined as follows:

(a)    The parties shall have sixty (60) days after the event triggering the sale or purchase to negotiate a purchase price which is to be the "fair market value" of the Partnership Units.

(b)    If the parties have not agreed upon the fair market value within the sixty-day period, the selling party shall appoint one appraiser at the selling party's expense, and the buying party shall appoint one appraiser at the buying party's expense.  The two appraisers shall appoint a third appraiser, with the expense of the third appraiser shared equally by the selling party and the buying party.  The first two appointments shall be completed within forty (40) days of the termination of the initial sixty-day period, and the two appraisers shall have an additional ten (10) days, which is a total of fifty (50) days from the expiration of the initial sixty-day period, to appoint the third appraiser.

(c)    The appraisers shall have sixty (60) days to determine the fair market value of the Partnership Units being sold, with the decision of the majority of the appraisers binding on all parties.

(d)    The closing shall occur within thirty (30) days following receipt of the decision of the appraisers.

9.5    Grounds For Termination.  The Partnership shall be dissolved and liquidated and its affairs wound up upon the occurrence of any of the following:

(a)    The sale or other disposition of all or substantially all of its assets.

(b)    The withdrawal of a General Partner if a substitute General Partner has not been timely admitted.

(c)    The transfer of the asset and liabilities of the Partnership to a Successor Entity pursuant to paragraph 9.6.

(d)    Notwithstanding the terms of this Agreement, the occurrence of any event which, under the laws of the State of South Dakota, would dissolve the Partnership and require its affairs to be wound up.

9.6    <u>Cancellation of Certificate</u>.  Upon the liquidation of the Partnership, the Certificate of Limited Partnership of the Partnership shall be canceled in accordance with the provisions of law, and the General Partner, or the person or persons required by law to carry out the winding up of its affairs, shall promptly notify all the Partners of such liquidation.

9.7    <u>Successor Entity</u>.  The following provisions govern transfers of assets to other entities:

(a)    The General Partner, or Limited Partners if there is no General Partner, may transfer all of the assets of the Partnership in kind to any Entity designated for that purpose ("<u>the Successor Entity</u>"), subject to the provisions of any loan agreement, if (1) dissolution occurs by reason of there being no remaining General Partner and all of the Limited Partners request such transfer and designate the Successor Entity, or (2) the General Partner at any time determines to make such transfer to a Successor Entity designated by him and obtains the prior written consent of all Limited Partners to such transfer.

(b)    The assets of the Partnership shall be transferred to the Successor Entity subject to both the liabilities of the Partnership and the liabilities of the Partnership to the withdrawing Partners provided for herein, and the Successor Entity shall assume such liabilities and shall hold the Partnership and the Partners harmless therefrom.

(c)    After any transfer to a Successor Entity, the rights and obligation of the Partners shall be as owners or members of the Successor Entity, and such rights and obligations shall be governed by the relevant documents of the Successor Entity and the laws applicable to the Successor Entity rather than this Agreement.  Each Partner agrees that the relevant documents of any Successor Entity shall contain provisions which preserve for the respective owners or members of the Successor Entity, to the extent practicable, the rights and obligations of the respective Partners provided for in this Agreement.

9.8    <u>Final Accounting</u>.  Upon liquidation of the Partnership, an accounting shall be made of the accounts of each Partner and of the Partnership's assets, liabilities, and operations from the date of the most recent accounting to the date of such dissolution.

9.9    <u>Liquidation/Distribution</u>.  If the Partnership is liquidated, unless the assets and liabilities of the Partnership are transferred to a Successor Entity pursuant to paragraph 9.6, the General Partner shall act as liquidating agent and shall wind up the affairs of the Partnership in an orderly manner.  The General Partner or liquidating agent shall apply and distribute the remaining Partnership assets in the following order of priority (and pro rata within a class if there are insufficient assets to pay all claims within a class):

(a)    To the payment of debts and liabilities of the Partnership (other than advances by the General Partner or the Limited Partners to the Partnership evidenced by promissory notes) and the expenses of liquidation;

(b)    To the setting up of such reserves as may be reasonably necessary for any contingent liabilities or obligations of the Partnership;

(c)    To the General Partner and the Limited Partners in amounts necessary for repayment of loans made to the Partnership;

(d)    To the Partners in accordance with their respective Profit/Loss Percentages.

9.10    <u>Termination</u>. A reasonable time shall be allowed for the orderly liquidation of the assets of the Partnership and the discharge of liabilities to creditors so as to enable the General Partner to minimize the normal losses attendant upon a liquidation. Each of the Partners shall be furnished with a statement prepared by the Partnership's then certified of public accountant which shall set forth the assets and liabilities of the Partnership as at the date of complete liquidation. Upon compliance with the distribution plan set forth in paragraph 9.8 hereof (including payment over to an escrow agent if there are sufficient funds therefore), the Limited Partners shall cease to be such, and the General Partner, as the sole remaining Partner of the Partnership, or the liquidating trustee, shall execute, acknowledge, and cause to be filed a certificate of cancellation of the Partnership. Upon completion of the liquidation, winding up, liquidating and distribution of the liquidation proceeds, the Partnership shall terminate.

## ARTICLE 10
## MISCELLANEOUS PROVISIONS

10.1    <u>Acts of Agent</u>. Any act which either party could do hereunder may also be done by and for such party by a duly constituted agent or attorney-in-fact. Proof of such relationship must be provided to the other party in writing, and the other party need not investigate whether such appointment remains valid. Each party shall be bound by the acts of its agent or attorney-in-fact and ratifies any acts done on such party's behalf by such agent or attorney-in-fact.

10.2    <u>Amendments</u>. This Agreement may be amended only in accordance with the following provisions:

(a)   The General Partner may amend this Agreement in writing

(1)   With the consent of the Limited Partners given by Ordinary Resolution; or

(2)   Without prior notice to or consent from any Limited Partner, upon receipt of a written opinion of legal counsel for the Partnership that such amendments:

(A)   Are for the purpose of adding to the Agreement (or amending existing provisions) any provision(s) which are for the protection of the Limited Partners, or

(B)   Are advisable to cure any ambiguity or to correct or supplement any provisions which are defective or inconsistent with any other provision of the Agreement, provided that, in the written opinion of such counsel, the cure, correction, or supplemental provision does not and will not adversely affect the interests of any Limited Partner.

(b)   Notwithstanding any provision of this Agreement, no amendment to this Agreement shall be effective without (1) the prior written approval of the General Partner, and (2) if the proposed amendment will, or is likely to, cause a Limited Partner to suffer and adverse economic effect, the prior written consent of such Limited Partner.

(c)   Except with the unanimous consent of all Partners, no amendment shall change the Partnership from a limited partnership to a general partnership, change the respective liabilities of the General Partner or the Limited Partners, or change the basis of participation of the Partners in the capital, cash distributions, or net income or losses of the Partnership.

(d)   The General Partner shall written notice of the full details of any amendment to this Agreement to all Partners within twenty (20) days of the effective date of the amendment.  Such notice shall comply with the notice provisions of this Agreement, including, but not limited to, paragraph 10.10.

10.3   <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors, and assigns.

10.4   <u>Captions</u>.  Captions are for convenience only and shall not be resorted to for purposes of interpretation or construction of this Agreement.

10.5   <u>Confidentiality</u>.  The terms and conditions of this Agreement, and any and all

matters related thereto, shall be kept and held in the strictest confidence and shall not be disclosed to any third parties, except for the accountants or attorneys of the Partners, or as may be required by law.

10.6   <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which shall be an original, but all of which shall constitute one instrument. Accordingly, this Agreement may be executed by each Partner on separate originals.

10.7   <u>Entire Agreement; Merger; Inducement</u>. This document constitutes the entire agreement between the parties with respect to the subject matter hereof and no amendment, modification, or alteration of the terms hereof shall be binding unless the same be in writing and adopted in accordance with the provisions of Article 6 of this Agreement. Course of dealing, course of performance, trade usage, or parol evidence may not be used to modify this Agreement. No party shall be bound by any terms, conditions, statements, or representations, whether oral or written, not contained herein. All previous negotiations, statements, and preliminary documents by the parties or their representatives are merged in this Agreement. Each party hereby acknowledges that in executing this Agreement he has not been induced, persuaded, or motivated by any promise or representation made by another party, unless expressly set forth herein.

10.8   <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws and decisions of the State of South Dakota.

10.9   <u>Grammatical Usages</u>. In this Agreement, the word "<u>may</u>" is used to indicate that an action either is authorized or is permitted, the word "<u>shall</u>" is used to indicate that an action is both authorized and mandatory, and the phrase "<u>may not</u>" is used to indicate that an action is both unauthorized and prohibited. The singular includes the plural and the masculine includes the feminine and the neuter.

10.10   <u>Notices</u>. All notices, demands, consents, or other instruments given or required to be given hereunder shall be in writing and mailed by certified mail, return receipt requested, postage prepaid, and shall be directed to the parties hereto at the addresses set forth herein. Notices to the Partnership shall be mailed to the office of the Partnership as specified herein. A party by like written notice may designate a different address to which subsequent notices shall be sent, and the General Partner may designate a different address to which subsequent notices to the Partnership shall be sent. A party bears full responsibility for notifying other parties of a change of address; notices sent to the last-known addresses determined in accordance with this paragraph are effective when sent even if not received.

10.11  <u>Partial Payment</u>.  No payment of a lesser amount than the amount due under this Agreement shall be deemed to be other than on account of the full amount due, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and a party may accept such check or payment without prejudice to the party's right to recover the balance due or pursue any other remedy provided under this Agreement.

10.12  <u>Partition</u>.  All parties hereto irrevocably waive any right to maintain an action for partition with respect to property of the Partnership.

10.13  <u>Power of Attorney</u>.  Each Limited Partner, by execution of this Agreement or a counterpart of this Agreement, or by authorizing such execution on his behalf, does irrevocably constitute and appoint the General Partner (or a successor General Partner), and each of them, as his true and lawful attorney and agent, with full power of substitution.  Upon the request of the attorney-in-fact, the Limited Partners shall execute any certificate or other instrument with respect to which the attorney-in-fact could have invoked this Power of Attorney.

(a)  <u>Powers</u>.  Such attorney-in-fact shall have full power and authority, in such Limited Partner's name, place, and stead, to execute, acknowledge, swear to, deliver, file, and record in the appropriate public offices (1) all certificates and other instruments (including counterparts of this Agreement) which such attorney-in-fact deems necessary or appropriate to qualify or continue the Partnership as a limited partnership in the State of South Dakota, (2) all instruments which such attorney-in-fact deems necessary or appropriate to effect a change or modification of the Partnership in accordance with the terms of this Agreement, (3) all conveyances and other instruments which such attorney-in-fact deems necessary or appropriate to effect the dissolution and termination of the Partnership, (4) all instruments relating to the admission of additional or substitute General Partners and/or Limited Partners, and (5) any other instruments which may be necessary or desirable to carry out the intention of this Agreement as determined by such attorney-in-fact in its sole and absolute discretion and not in contravention of this Agreement.

(b)  <u>Qualifications</u>.  The foregoing grant of authority (1) shall survive the death, incompetence, or termination of existence of any or all of the Limited Partners, (2) may be exercised by such attorney-in-fact for the Limited Partners and for all of the Limited Partners, (3) shall bind any Person who becomes a substitute or additional Limited Partner pursuant to this Agreement, and (4) shall continue to bind any Limited Partner who assigns the whole or any portion of his Partnership Interest, except that, if the assignee of the whole of any Limited Partner's Partnership Interest has been approved by the General Partner for admission to the Partnership as a substitute Limited Partner, then, as to such assigning Limited Partner, this

Power of Attorney shall survive the delivery of such assignment for the sole purpose of enabling the General Partner to execute, acknowledge, and file any instrument necessary to effect such substitution.

10.14  <u>Severability</u>. If a provision of this Agreement is held invalid, all valid provisions that are severable from the invalid provision remain in effect. If a provision of this Agreement is held invalid in one of more of its applications, the provision remains in effect in all valid applications that are severable from the invalid application or applications.

10.15  <u>Statutory References</u>. In this Agreement, each reference to a particular statute, regulation, or provision thereof shall be deemed to be a reference not only to such statute, regulation, or provision, but also to any similar, superseding, or amended statute, regulation, or provision.

10.16  <u>Legal Representation</u>. The General Partner is represented by Dana J. Frohling of Frohling Law Office, attorneys at law, Britton, South Dakota, USA, and the Limited Partners are represented by James Park of Hunul Professional Law Corporation, attorneys at law, Seoul, Korea. All parties, by signing below, acknowledge that they have had ample opportunity to consult with such advisors, legal or otherwise, as they each deem necessary and appropriate.

IN WITNESS WHEREOF, the undersigned have executed this Limited Partnership Agreement as of the date first above written.

**GENERAL PARTNER(S):**

Date: January 30, 2006

THE DAIRY DOZEN–VEBLEN, LLP

By: _____
     Richard Millner, Its Managing Partner

Subscribed and sworn to before me this 30 day of January, 2007.

_____
Notary Public
My Commission Expires: 20 July 2010

KAREN J. HORNSETH
NOTARY PUBLIC
SOUTH DAKOTA

## Certification of Limited Partner

I certify that I have read and understand the foregoing Veblen East Dairy Limited Partnership Agreement, that I have had the opportunity to consult with such advisors, legal or otherwise, as I deem necessary and appropriate, and that I am voluntarily signing this agreement and I have not been induced, persuaded, or motivated by any threat, promise, or representation made by anyone to me, unless expressly set forth above.

I further certify that I am an "accredited" investor within the meaning of the Securities Act of 1933 and regulations thereunder in that (a) if I am a natural person, (i) I have an individual net worth, or joint net worth with my spouse, at the time of my purchase, exceeding $1,000,000, or (ii) I had an individual net income in excess of $200,000 in each of the two most recent years or joint income with my spouse in excess of $300,000 in each of those years and have a reasonable expectation or reaching the same income level in the current year; (b) if I represent an entity, the entity was not formed for the specific purpose of acquiring the securities offered and has total assets in excess of $5,000,000; (c) if I represent a trust, the trust was not formed for the specific purpose of acquiring securities offered and has total assets in excess of $5,000,000; (d) if I represent an entity, all of the equity owners are "accredited investors."

I hereby apply for admission to the Veblen East Dairy Limited Partnership as a Limited Partner. I agree to make the Capital Contribution within 10 calendar days following successful completion of the immigration interview days following the date of my signature. I agree to be bound by all of the terms of the Veblen East Dairy Limited Partnership Agreement.

I understand and acknowledge that, if and when I attempt to sell my interest in Veblen East Dairy Limited Partnership, I must first offer such interest to the General Partner(s).

**LIMITED PARTNER:**

Subscribed and sworn to before me this _____ day of _____, 2007.

_____

HUH, Yong Jin

Date: _2-25-07_____, 2007

_____
Notary Public
My Commission Expires:

## Attorney Approval

The foregoing Veblen East Dairy Limited Partnership Agreement has been read and approved as to form on behalf of the above-named Limited Partner by the undersigned attorney.

Date: _2-28-07_____

_____
James Park

# EXHIBIT B

## GUARANTY AND PLEDGE AGREEMENT

This Guaranty and Pledge Agreement (the "Agreement") is made on the 30 day of April_____, 2009, by The Dairy Dozen-Veblen LLP (the "Guarantor") in favor of Hanul Professional Law Corp., a California corporation acting as the trustee of the limited partners of Veblen East Dairy Limited Partnership and other interested entities (the "Lender"), as making pooled loan to Borrower follows:

BACKGROUND OF AGREEMENT:

A.    The Lender and Veblen East DAIRY Limited Partnership, a South Dakota limited partnership (the "Borrower"), have on this day entered into a Loan Agreement (the "Loan Agreement") under the terms of which the Lender will lend $2,000,000 to the Borrower.

B.    The Guarantor has a substantial financial stake in the Borrower and will substantially benefit from the performance by Lender of its obligations under the Loan Agreement.

C.    The execution of this Agreement is an express condition to the consummation of the transactions contemplated by the Loan Agreement and the Lender is unwilling to enter into or perform in accordance with the Loan Agreement in the absence of the execution of this Agreement.

THEREFORE, in consideration of the obligations to be assumed by the Lender pursuant to the Loan Agreement, and further as an inducement to the Lender to enter into and perform in accordance with the Loan Agreement, the Guarantor hereby agrees as follows:

1.    DEFINITIONS. In this Agreement, the following frequently used terms are defined as set forth in this Paragraph 1:

(a)    Any terms used in this Agreement which are defined in the Loan Agreement will have the same meaning herein as is ascribed to such term in the Loan Agreement.

(b)    The "Contract Documents" are, collectively, the Loan Agreement, this Guaranty and Pledge Agreement between the Lender and the Borrower dated this day as well as the Guaranty and Pledge Agreement between Lender and Richard Millner dated this same day.

(c)    The "Obligations" mean all of the obligations of the Borrower and the Guarantor pursuant to the Contract Documents.

(d)    The term "Guarantor" means The Dairy Dozen-Veblen LLP.

(e)    The "Securities" means the securities of the Borrower listed on Schedule I attached to this Agreement and made a part hereof; together with all other or additional securities to which the Guarantor (without additional consideration) now is, or hereafter may be, entitled by virtue of his ownership of any of the securities as a result of any corporate reorganization, merger or consolidation, stock split, stock dividend, or otherwise.

(f)  A "Default" means the occurrence of an event of default by the Borrower pursuant to or in accordance with the provisions of any of the Contract Documents or the failure of the Guarantor to perform any covenant or agreement contained in this Agreement or if any representation or warranty contained in this Agreement is found to have been untrue, incomplete or misleading in any material respect when furnished.

(g)  The "Collateral" means all assets, property, and interests in assets and property in which a security interest is granted and a pledge is made by the Guarantor pursuant to paragraph 3 below.

2.     GUARANTY. The Guarantor unconditionally and irrevocably guaranties to Lender the full and prompt payment and performance when due, whether at maturity or earlier (by reason of acceleration) and at all times thereafter, of all of the Obligations, and further agrees to pay all costs and expenses including, without limitation, all court costs and reasonable attorneys' fees and expenses paid or incurred in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, Borrower or the Guarantor.

3.     PLEDGE OF SECURITIES. In addition, to secure the payment and performance of the Obligations, the Guarantor hereby grants to Lender a security interest in and hereby pledges and assigns to Lender the Securities, with stock powers attached thereto all duly endorsed in blank, herewith delivered to Lender, and any and all dividends, distributions and other proceeds thereof.

4.     TERMS AND CONDITIONS.

(a) Subject to the provisions of the Contract Documents, Lender shall have the exclusive right to determine the application of payments and credits, if any, received by Lender from the undersigned, the Borrower, the Senior Lender, and any Customer.

(b)  Lender is authorized, without notice or demand, and without affecting the liability of the Guarantor, from time to time to (i) renew, extend, accelerate or otherwise change the time for payment or performance of, or other terms relating to, the Obligations or any of them, or otherwise modify, amend or change the terms of the Contract Documents or any of them, or any other agreement, document or instrument now or hereafter executed by the Borrower and delivered to Lender; (ii) accept partial payments on or performance of the Obligations; (iii) take and hold security or collateral for the undersigned's Obligations under this Agreement, or any other guaranties of, or support or security agreement relating to, the Obligations and exchange, enforce, waive and release any such security or collateral; (iv) apply such security or collateral and direct the order or manner of sale as in its sole discretion it may determine; and (v) settle, release, compromise, collect or otherwise liquidate the Obligations and any security or collateral in any manner, without affecting or impairing the Obligations of the undersigned.

(c)  At any time after a Default, Lender may, at its discretion, upon notice to the Guarantor and regardless of the acceptance of any security or collateral for the payment, appropriate and apply toward the payment and satisfaction of the Obligations (i) any indebtedness due or to become due from Lender to the Guarantor; and (ii) any monies, credits or other property belonging to the Guarantor, at any time held by Lender on deposit or otherwise.

(d)  Lender shall not be required to take any steps to preserve any rights against prior parties (if any) to or in any of the Collateral or Obligations.

(e)   Lender may, but shall not be obligated to, and the undersigned designates Lender as attorney-in-fact to, contest, pay and/or discharge all liens, encumbrances, taxes or assessments on, or claims, actions or demands against any of the Collateral upon notice to, but without the consent of, the undersigned and to take all actions and proceedings in their name or in the name of the Borrower or of any other appropriate person to remove or contest such liens, encumbrances, claims, actions, demands, taxes or assessments by litigation or otherwise. The undersigned agrees to pay on demand all costs, attorneys' fees, expenses, and all other sums advanced or paid by Lender pursuant to this paragraph 4(e).

(f)   Lender may, at its discretion, file one or more financing statements, and in that respect to serve as the attorney-in-fact for the undersigned for the purpose of executing such financing statements under the Uniform Commercial Code, naming the Guarantor as debtor and Lender as secured party, and describing the types or items of Collateral. Lender may further serve as the attorney-in-fact for the Guarantor for the purpose of executing any additional notices, affidavits or other documents as Lender may deem necessary to protect its security interest. The Guarantor agrees to pay on demand the amount of any and all filing fees and expenses which Lender deems necessary to incur to protect its interest in the Collateral.

(g)   Lender shall exercise reasonable care in the custody and preservation of the Collateral to the extent required by applicable statute, and shall be deemed to have exercised reasonable care if it takes such action for that purpose as the undersigned shall reasonably request in writing; but under no circumstances shall any omission to comply with any such request of itself be deemed a failure to exercise reasonable care. The undersigned agrees to pay on demand any cost or expense, including without limitation, attorneys' fees and costs incurred by Lender in the reasonable preservation of the Collateral.

(h)   The Guarantor consents and agrees that Lender shall be under no obligation to marshal/ any assets against, or in payment of, any or all of the Obligations. Guarantor further agrees that to the extent the Borrower makes a payment(s) to Lender, which payment(s) are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy act, state or federal law, common law or equitable cause, then to the extent of such payment or repayment, the obligation intended to be satisfied shall be renewed and continued in full force and effect as if said payment had not been made, and the Guarantor shall, upon demand by Lender, immediately satisfy such obligation in full in accordance with the terms of this Agreement. The Guarantor further agrees that any and all claims of the Guarantor against the Borrower or against its properties, arising by reason of any loan, advance, investment or other payment by the undersigned to Lender shall be subordinate and subject in right of payment to the prior payment, in full, of all sums due pursuant to the Obligations.

(i)   The Guarantor assumes responsibility for keeping himself, herself or itself informed of the financial condition of the Borrower and of all other circumstances bearing upon the risk of Default. Lender shall have no duty to advise the Guarantor of information known to Lender regarding such condition or circumstances.

(j)   No delay on the part of Lender in the exercise of any right or remedy shall operate as a waiver or constitute a discharge any of the Guarantor's obligations under this Agreement, and no single or partial exercise by Lender of any right or remedy shall preclude the further exercise to any extent; nor shall any modification or waiver of any of the provisions of this Agreement be binding upon Lender except as expressly set

forth in a writing duly signed and delivered by an authorized officer of Lender. Lender's failure at any time to require strict performance by the Borrower or any other party of any of the provisions, warranties, terms and conditions contained in the Contract Documents shall not discharge any of the Guarantor's obligations under this Agreement, nor shall it waive, affect or diminish any right of the Lender at any time to demand strict performance and such right shall not be deemed to have been waived by any act or knowledge of Lender unless such waiver is contained in an instrument in waiting, signed by an officer of Lender specifying such waiver. No waiver by Lender of any default shall operate as a waiver of either any other default or the same default on a future occasion, and no action or inaction by Lender including, without limitation, Lender's failure to take any steps to preserve its rights in the Collateral, shall in any way affect or impair Lender's rights or the obligations of the Guarantor under this Agreement. The Guarantor agrees that his obligations under this Agreement will not be discharged except by complete performance of all of the Obligations. Any determination by a court of competent jurisdiction of the sums owing by the Borrower to Lender shall be conclusive and binding on the Guarantor irrespective of whether the Guarantor was a party to the suit or action in which such determination was made.

5.    WARRANTIES AND REPRESENTATIONS. The Guarantor hereby represents and warrants to the Lender that:

(a)    The execution, delivery, and performance by the Guarantor of this Agreement will not violate any provision of law, any order of any court or other agency of government, or any agreement or other instrument to which the Guarantor is a party or by which the Guarantor is bound or be in conflict with, result in a breach of or constitute (with due notice or lapse of time, or both) a default under any such agreement or other instrument, or result in the creation or imposition of any lien, charge, or encumbrance of any nature whatsoever upon any of the property or assets of the Guarantor, except as contemplated by the provisions of this Agreement;

(b)    This Agreement constitutes the legal, valid and binding obligation of the Guarantor and is enforceable against the Guarantor in accordance with the terms hereof;

(c)    As to such of the Collateral deposited with the Lender on the date hereof (i) the Guarantor is the legal and beneficial owner of the Securities; (ii) the Securities are validly issued, fully paid and non-assessable, and represent the percent of issued and outstanding shares of stock of (or other interest in) the Borrower as set forth in Schedule I; (iii) the securities transfer forms attached to the Certificates representing such Collateral have been duly executed and delivered by the Guarantor to Lender; and (iv) none of the Collateral is subject to any security interest, pledge, lien or other encumbrance or adverse claim of any nature whatsoever.

6.    VOTING RIGHTS. Unless and until a Default hereunder shall have occurred, the Guarantor shall be entitled to exercise all voting powers pertaining to the Securities owned by the Guarantor for any purposes not inconsistent with, or in violation of, the provisions of this Agreement in all corporate matters.

7.    DEFAULT. (a)    Upon and during the continuance of any Default, Lender may, at its sole election: (i) proceed directly and at once, without notice, against the Guarantor to collect and recover the full amount or any portion of the Obligations, without first proceeding against the Borrower or any collateral or any other party or any other person, firm or corporation; (ii) with or without notice, transfer to or register in the name of itself or its nominee any of the Securities, and whether or not so transferred or registered, receive the income and dividends, including stock dividends and rights to

subscribe, and hold the same as a part of the Collateral to secure the performance and payment of the Obligations, and/or apply the same as provided in this Agreement; (iii) exchange any of the Securities for other property upon the reorganization, recapitalization, or other readjustment of the Borrower, and (iv) vote the Securities and exercise or cause its nominee to exercise all or any powers with the same force and effect as an absolute owner. All of the above rights and powers may be exercised by Lender without liability, except the obligation to account for property actually received.

(b)    In addition to any other rights given by law and under this Agreement, Lender shall have the rights and remedies with respect to the Collateral of a secured party under the Illinois Uniform Commercial Code (whether or not that Code is in effect in the jurisdiction where the rights and remedies are asserted) all of which remedies shall be cumulative, and none exclusive, to the extent permitted by law. Lender may sell or cause to be sold, in one or more sales or parcels, at such price or prices as Lender may deem best, and for cash or on credit or for future delivery, without assumption of any credit risk, all or any of the Collateral, at public or private sale, without demand of performance but with notice to the undersigned, and the purchaser of any or all of the Collateral so sold shall then hold the same absolutely, free from any claim or right of any kind including (but not limited to) any equity of redemption of the Guarantor. Any requirements of reasonable notice shall be met if such notice is mailed, postage prepaid, to the Guarantor at the address set forth below at least ten (10) days before the time of the sale or disposition. Any other requirement of notice, demand or advertisement for sale is waived. Lender may, in its own name, or in the name of its designee, buy at any public or, if permitted by law, any private sale, and, in lieu of the actual payment of the purchase price, Lender may set off the amount of such price against the Guarantor's obligations hereunder. The undersigned will pay to Lender all expenses (including attorney's fees) of, or incident to, the enforcement of any of the provisions of this Agreement.

(c)    Any right to set-off exercised by Lender shall be deemed to have been exercised immediately on the occurrence of a Default, even though such set-off is made or entered on the books of Lender at any subsequent time.

(d)    In view of the fact that federal and state securities laws may impose certain restrictions on the method by which a sale of the Securities may be effected, it is agreed that in the event of a Default, Lender may from time to time attempt to sell all or any part of the Collateral by means of a private placement, restricting the bidders and prospective purchasers to those who will represent and agree that they are purchasing for investment only and not for distribution. The undersigned agrees that acceptance by Lender of the highest offer after soliciting offers from two or more potential buyers would be commercially reasonable.

(e)    Lender, at any time and at its option, may apply all or any net cash receipts from the sale of Collateral to the payment of the Obligations, applying or reapplying, or distributing or allocating the same as it shall elect, whether or not then due. In case of any sale by Lender of any of the Collateral on credit or for future delivery, the property sold may be retained by Lender until the selling price is paid by the purchaser, but Lender shall incur no liability in case of failure of the purchaser to take and pay for the property so sold. In case of any such failure, the property so sold may be again similarly sold.

8.    INDEMNIFICATION. The Guarantor will at all times, now and hereafter, indemnify and hold Lender harmless from and against all loss or damage arising in connection with this Agreement and against all claims, liability, demands, actions or suits, and all liabilities, payments, costs, charges and expenses including, but not limited to, attorneys' fees and costs incurred by Lender on account of or in connection with the Agreement or the transactions or assertions of rights contemplated or permitted hereunder.

9.    MISCELLANEOUS. (a)        This Agreement shall be binding upon the undersigned and upon the heirs, executors, successors and assigns of the undersigned and shall inure to the benefit of Lender's successors and assigns; all references to the Borrower and to the undersigned shall be deemed to include their respective successors, assigns, participants, receivers or trustees (as the case may be).

· (b)  This Agreement embodies the entire understanding of the parties pertaining to the subject matter hereof, and shall constitute a continuing agreement applicable to future as well as existing transactions between the Lender and the Borrower.

(c)  THIS AGREEMENT HAS BEEN DELIVERED AT AND SHALL BE DEEMED TO HAVE BEEN MADE IN VEBLEN, SOUTH DAKOTA, AND SHALL BE INTERPRETED, AND THE RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAWS OF THE STATE OF SOUTH DAKOTA, AND AS PART OF THE CONSIDERATION FOR LENDER'S PERFORMANCE PURSUANT TO THE CONTRACT DOCUMENTS, THE UNDERSIGNED CONSENTS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURT LOCATED WITHIN THE STATE OF SOUTH DAKOTA, AND FURTHER CONSENT THAT ALL SUCH SERVICE OF PROCESS BE MADE BY CERTIFIED OR REGISTERED MAIL DIRECTED TO THE UNDERSIGNED AT THE ADDRESS STATED HEREIN AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED TWO (2) DAYS AFTER THE SAME SHALL HAVE BEEN POSTED. THE UNDERSIGNED FURTHER CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT.

(d)  The headings used in this Agreement are for the convenience of the reader only; such headings constitute no part whatsoever of the Agreement between the parties.

(e)  No invalidity, irregularity or unenforceability of the Obligations (or any of them) hereby secured shall affect, impair or be a defense to any provision contained in this Agreement. If any term, condition or provision of this Agreement is determined to be invalid or unenforceable, such determination shall not affect the validity or enforceability of any other term, condition or provision of this Agreement.

(f)  If this Agreement shall differ or conflict in terms with any of the Contract Documents, the Agreement which gives Lender the greater right, as determined by Lender, shall prevail.

GUARANTOR:

DAIRY DOZEN-VEBLIN LLP

_(signature)_

Richard Millner

Its: _Managing Partner_

STATE OF _South Dakota_ }

COUNTY OF _Marshall_ }

On this the ___30___ day of _April_,

_2009_
2009, before me, _Karen Hornseth_, the

undersigned officer, personally appeared _Richard Millner_

_____, known to me or satisfactorily proven to be the person(s)

whose name(s) are subscribed to the within instrument and acknowledged that

(he)(she)(they) executed the same for the purposes therein contained.

In witness whereof I hereunto set my hand and official seal.

_Karen J Hornseth_

_Notary Public_

KAREN J. HORNSETH
NOTARY PUBLIC
SOUTH DAKOTA

Title of Officer

Date Commission Expires: _20 July 2010_

SCHEDULE I

SECURITIES OF THE GUARANTOR

Veblen East Dairy Limited Partnership Units amounting to 39% ownership of the Veblen East Dairy Limited Partnership as per the addendum to the partnership agreement dated October 15, 2008.