UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH DAKOTA

o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o

|  |  |  |
|---|---|---|
| | : | Case No. 10-10146 |
| In re: | | (Chapter 11) |
| | : | |
| VEBLEN EAST DAIRY, LLP, | | **PRE-HEARING BRIEF IN** |
| Tax ID/EIN: 20-8870979, | : | **SUPPORT OF AGSTAR'S** |
| | | **MOTION TO EXCUSE** |
| Debtor. | : | **COMPLIANCE WITH** |
| | | **11 U.S.C. § 543** |

o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o

AgStar Financial Services, PCA and AgStar Financial Services, FLCA

("AgStar"), submits this pre-hearing brief in support of its motion to excuse Debtor's

receiver's compliance with 11 U.S.C. § 543(a), (b), (c).

## I.      Introduction.

AgStar's motion under 11 U.S.C. § 543 presents one primary issue.  Until the

Court has the opportunity to resolve important issues regarding cash collateral usage, the

appointment of a Chapter 11 Trustee, and the authority of Debtor's general partner to

even file a Chapter 11 petition, The Court should permit the Debtor's receiver, Value

Added Science and Techology to continue to do the laudable job it has done in managing

the Debtor since being appointed by the Minnesota District Court.  The Court should not

permit Richard Milner and Prairie Ridge Management to resume control over the Debtor,

under the guise of the appointment of a "reorganization expert," when they have now

mismanaged five entities into Chapter 11 Bankruptcy for the benefit of themselves, other

preferred sister entities, and favored insiders.  Instead of permitting the Debtor to unnecessarily expend the funds in educating a brand new management team that will likely act at Millner's behest in any event, the Court should permit VAST to continue managing Debtor's affairs.

## II.    Facts.

The facts set forth here are as AgStar believes they will be demonstrated at the hearing on its motion.  Debtor filed a voluntary Chapter 11 Petition on July 2, 2010. (Doc. 1.)  As of the Petition date, Debtor owed AgStar over $45 million in principal and interest on multiple obligations.  AgStar holds a valid and perfected first position blanket security interest in Debtor's agricultural and business personal property and priority real-estate mortgages securing the obligations.  Despite the parties' execution of forbearance agreements, extending Debtor's time to pay its obligations to AgStar, Debtor has been in default of those obligations for some time.

Debtor and Debtor Veblen West Dairy Limited Partnership are part of an integrated dairy production system together with Debtor's general partner, The Dairy Dozen-Veblen, LLP, which has filed bankruptcy in the District of South Dakota, Case No. 10-10147, The Dairy Dozen-Milnor, LLP, which has filed bankruptcy in the District of North Dakota, Case No. 10-30377, The Dairy Dozen-Thief River Falls, LLP, which has filed bankruptcy in the District of Minnesota, Case No. 10-60438 (since converted to Chapter 7), along with New Horizon Dairy, LLP, Vantage Cattle Company, LLP, and

Short Foot Calf Ranch, Inc.

All of the dairy entities have been managed by Prairie Ridge Management, LLC ("PRM"), which is managed and primarily owned by Rick Millner.  In addition, there is common, but not mirror image ownership and management of these various entities, including most particularly, Rick Millner.  The underlying owners of some of the entities are also personal guarantors of the AgStar debt and do business with some of the entities.  AgStar incorporates by reference here all of the facts, law, and argument alleged in its Motion to Appoint Chapter 11 Trustee in West's Chapter 11 Case No. 10-10071 at Doc. 250, rather than restating them.

Prior to filing, Debtor was under a State Court receivership ordered by the Minnesota District Court, CIV.10-714, and an ancillary appointment of that receiver by Order entered in Marshall County State Circuit Court on March 23, 2010.  VAST, acting through Steven Weiss, its Manager, was serving as court-appointed Receiver on the date of filing.  The Debtor, by and through its general partner, The Dairy Dozen-Veblen LLP, consented to VAST's appointment and the terms of the receivership with the advice and consent of counsel.  VAST and its principal, Steven Weiss, are very experienced and highly regarded in the animal industry.

Using that experience VAST has accomplished numerous important tasks since taking over management.  It has stabilized Debtor's work force after Millner's and other insiders' efforts to encourage Debtor's employees to leave the Debtor and work for West.

3

It negotiated a settlement with the SD DENR on important environmental issues, and developed a brand-new waste-management plan after PRM serially and repeatedly failed to comply with DENR regulations, and after Millner's favored insiders, who owned land that was part of Debtor's manure-management dispersion plan, refused to permit the receiver to continue using the land for manure disposal. It has protected the Debtor from unfair transactions with insiders, including the eve-of-bankruptcy transactions described at paragraphs 20-26 of AgStar's Motion to Appoint Chapter 11 Trustee. It has also evaluated the Debtor's financial prospects on a going concern and liquidation basis, established effective relationships with vendors and secured creditors, after PRM had damaged those relationships, and timely submitted detailed reports on the Debtor's operation to the Minnesota District Court.

The Debtor recognizes VAST's accomplishments. Debtor has acknowledged that its facilities and cow herd are now in excellent condition, that it has a solid group of employees, and that its production numbers are strong relative to the dairy production industry in general. (Doc. 16 at ¶ 15.) Clearly VAST has been faithfully discharging its duties. However, despite all of these efforts, and despite the fact that the Debtor has received approximately $1.5 million in protective advances from AgStar since March 1, 2010, the Debtor has been unable to reach break even without the burden of significant debt service.

In addition to pre-bankruptcy issues, there are numerous issues arising from the

filing itself and from post-bankruptcy conduct. The Debtor's majority owners, Korean limited partners, claim to own or at least control the Debtor. The Dairy Dozen-Veblen, LLP, claims to still be Debtor's general partner and Millner is its managing partner. There are significant questions involving who had the authority to authorize and execute the Debtor's bankruptcy petition and who had the authority to continue to operate the Debtor post-filing. Related issues include the effect of a foreclosure by the limited partners on the interest of the general partner, the application of the limited partnership agreement and the effect of the state court receivership order. All of these issues remain to be resolved.

Rick Millner's inability to manage the various dairies and related entities and obligations consistent with his fiduciary duties and without regard to his self-interests was exposed in Veblen West's case, specifically in relation to AgStar's motion to appoint a trustee. West responded to Millner's obvious conflicts by appointing another insider with conflicts, Michael Wyum, as the new manager of West on the eve of the hearing on AgStar's Motion for Appointment of a Trustee. The latest ploy to obscure Millner's control over the dairy entities is to appoint Steven Nerger of Silverman Consulting as Chief Restructuring Officer ("CRO") for the Debtor. It is clear, based upon Debtor's own filings, however, that the CRO intends to leave PRM (Millner) in charge of the day to day operations of the Debtor. And it is also obvious that the restructuring officer will not be independent because he will answer to The Dairy Dozen-Veblen (Millner) as the

general partner.

## III.    Argument.

11 U.S.C. § 543 provides that a "custodian," which includes a state court receiver, that acquires knowledge of the commencement of a bankruptcy case may not take any action with regard to the Debtor's property except action necessary to preserve the Debtor's property.  *See* 11 U.S.C. § 543(a).  In addition, on the date the receiver learns of the commencement of the case, the receiver must deliver to the Trustee (or in the case of a Chapter 11 case, the Debtor) the Debtor's property held by the receiver.  (*See* 11 U.S.C. § 543(b)).[1]  However, 11 U.S.C. § 543(d) provides that after a notice and hearing, the Court may excuse compliance with the remainder of this section in the interest of creditors and, if the Debtor is not insolvent, of equity security holders as well, and permit the receiver to continue in possession.  (*See* 11 U.S.C. § 543(d)(1)).  The interest of the Debtor are never considered.  *See In re Dill*, 163 B.R. 221, 225 (Bankr. E.D.N.Y. 1994).

---

[1]Debtor has suggested that VAST cannot remain in control because it relinquished authority after learning of Debtor's bankruptcy filing.  But 11 U.S.C. § 543 is self-executing on its face and requires the receiver to relinquish control as soon as the receiver learns of the bankruptcy filing.  It does not provide a mechanism by which a custodian may remain in possession while asking to be excused from turnover.  So if VAST had violated 11 U.S.C. § 543(b) and maintained control of the Debtor, the motion before the Court would be one brought by Debtor to find VAST in contempt.  Contrary to Debtor's argument, and the lone authority cited by the Debtor, *In re Watkins*, 63 B.R. 46 (Bankr. D. Col. 1986), the statute does not provide for the sort of "heads I win tails you lose" result the Debtor seeks here.  If the Debtor and the Court in *Watkins* were correct, receivers would have to run the risk of facing a motion for contempt in order to preserve the right to bring a motion to excuse compliance under § 543(d).  The *Watkins* decision does not comport with the plain meaning of the text of the statute.

In analyzing creditor's interest, the Court will examine a number of factors including (1) the likelihood of a reorganization; (2) the probability that funds required for a reorganization will be available; (3) whether there have been instances of mismanagement by the Debtor; and (4) whether turn over would be injurious to creditors. *See, e.g., In re Northgate Terrace Apartments*, 117 B.R. 328 (Bankr. S.D. Ohio 1990) (citing *In re Poplar Springs Apartments of Atlanta, Ltd.*, 103 B.R. 146, 150 (Bankr. S.D. Ohio 1989); (*First Nat'l Bank v. Powers Aero Marine Serv. (In re Powers Aero marine Serv.)* 42 B.R. 540 (Bankr. S.D. Tex. 1989)). Motions under 11 U.S.C. § 543(d) are "fact intensive, turning upon whether the assets of the particular debtor should be administered by the existing custodian or returned to the debtor." *See, e.g., In re Uno Broadcasting Corp.*, 167 B.R. 189 (Bankr. D. Ariz. 1994).

Unlike the burden of proof adopted by some courts regarding appointing a trustee under 11 U.S.C. § 1104, i.e., clear and convincing evidence, the burden of establishing cause under § 543(d) to excuse a receiver from turnover is only a preponderance of the evidence. *See, e.g., In re Lizeric Realty Corp.*, 188 B.R. 499 (Bankr. S.D.N.Y. 1995) (collecting cases).

### A.  It is unlikely that a reorganization will be possible.

The remoteness of the Debtor's ability to reorganize has been discussed in other pleadings. Debtor owes AgStar alone over $45 million. AgStar has already entered into forbearance agreements with the Debtor to give it time to work through its financial

difficulties, all to no avail.  Even after the receiver took over operations and, as the Debtor admits, maintained the cattle herd, employees, milk production, and other matters in good stead, Debtor has only survived because AgStar has provided additional capital infusion in the form of $1.5 million in protective advances.  The Debtor's chances of a successful reorganization are bleak at best.  *See, e.g., In re Bryant Manor, LLC*, 422 B.R. 278, 290 (Bankr. D.Kan. 2010) (noting that where debtor had failed to service its debt in any meaningful manner in the months leading up to filing for bankruptcy, successful reorganization was sufficiently in doubt that receiver was excused from turnover).

And, although it is not the Debtor's burden under § 543 to show the court a Chapter 11 plan can be confirmed, in considering the possibility of a reorganization, once evidence is presented suggesting it is in the best interest of creditors for a custodian to remain in place, the "debtor does have an obligation to present at least the framework of a plan which, under the right circumstances could be confirmed." *See In re Plihal*, 97 B.R. 561, 564 (Bankr. D. Neb. 1989).  Here, in light of the disorganized and confusing nature of the Debtor's cash-collateral filings, the Debtor could not hope to present even the vaguest sketch of where it proposes to be in a few months.

**B.      The mismanagement by the Debtor is readily apparent.**

PRM's/Millner's mismanagement of the Debtor has been presented to this Court in Debtor's sister-entity, Veblen West's bankruptcy, Case No. 10-10071.  Similar evidence will be presented and will be equally applicable here, and should be considered

in conjunction with AgStar's motion to appoint trustee in Debtor's case before VAST is relieved of its responsibilities.

For example, the evidence has shown and will still show that substantial sums owed by Debtor to certain insiders and/or guarantors were assigned to West in exchange for promissory notes.  The debt assigned was non-accruing, insider, aged debt.  PRM then had West offset this debt against some of Debtor's receivables representing current cash advances made by Debtor to sustain Veblen West's and Vantage's operations, even though Debtor was insolvent at the time, and even though Debtor and West and Debtor and Vantage did not share common ownership or creditors.  These transfers reduced Debtor's current accounts receivable, which it was relying on to obtain cash from West so that it could pay its bills.  (Doc. 46 at ¶¶ 20-27.)  This is just one example of the myriad preferential transfers and fraudulent conveyances Millner engineered while managing all of the dairies.

Millner's mismanagement was not limited to financial matters.  As the evidenced showed at the hearing on the motion to appoint a trustee for West, PRM/Millner have serially failed to comply with the environmental regulations of three different states, including directives from the South Dakota Department of Natural Resources.  (Case No. 10-10071 at Doc. 250, pp. 40-45.)  One of the debtor dairies, New Horizon, was even shut down because of environmental concerns, and has since had its Chapter 11 case converted to Chapter 7.

9

Millner's conduct regarding finances and environmental matters has continued post-bankruptcy.  It also appears that since the date of West's Chapter 11 filing, PRM, as directed by Millner, has had West use over $300,000 in feed owned by the Debtor and located at a depot in Veblen, SD, without having West pay the Debtor, further crippling Debtor financially.  (Case No. 10-0071 at Doc. 256).  As a result, the party that directed West to use Debtor's property without paying is the party that will also be deciding whether the Debtor should pursue West for payment. Millner has also encouraged the Debtor's best employees to quit working for the Debtor, and work for West instead.  The evidence will show that VAST has worked long and hard to repair these relationships, and keep a high-quality workforce employed at the Debtor.

C.      **Turnover would be injurious to creditors because the receiver has been in place for a significant amount of time, and done a remarkable job, while Debtor's "new" management will likely be no different than its prior management.**

Even if the issues of successful reorganization and potential mismanagement are resolved favorably to the debtor, the court may still excuse compliance if turnover would be injurious to creditors.  *See, e.g., In re Poplar Springs Apartments of Atlanta, Ltd.*, 103 B.R. at 150.  For instance, when the receiver has been in place for a significant amount of time, this is another factor weighing in favor of excusing turnover, since "leaving matters in the status quo will favor reorganization and efficiency."  *See, e.g., In re LCL Income Prop., LP*, 177 B.R. 872, 876 (Bankr. S.D. Ohio 1995).  This is particularly the case where the custodian would be required to turnover assets to a third party, rather than

to preexisting management. *See, e.g., In re Uno Broadcasting Corp.*, 167 B.R. 189, 201 (Bankr. D. Ariz. 1994). Courts in that situation have noted the disruption, duplication, and cost of such a transfer warrants excuse from turnover. *Id*. at 201. For instance, in *In re Bryant Manor, LLC*, the Court noted that the Debtor wanted its operations turned over to a separate management company. 422 B.R. at 289-290. The Court found that this alone lessened the presumption in favor of turnover.

It is unclear who will be running the Debtor if there is a turnover. It will certainly not be the Debtor. Whether the Court accepts Debtor's claim that the "CRO" Mr. Nerger will be autonomously running the Debtor's affairs, or instead recognizes that Debtor's appointment of a "CRO" like West's appointment of Wyum will be meaningless, the Debtor will not be in control. This favors excuse from turnover. There is no reason to permit the Debtor to incur the expense in educating a "CRO" about Debtor's affairs when VAST is already fully up to speed on all pertinent matters. There is also no reason to return control of the Debtor to Millner/PRM, and place the interests of the Debtor and its creditors at further peril from mismanagement, when there are so many questions regarding Millner's authority to file the petition, use of cash collateral and the potential appointment of a trustee that should be resolved first.

**IV.    Conclusion**

AgStar is not asking the Court to permit VAST to liquidate Debtor's assets. Instead, AgStar is asking the Court to recognize that there are significant issues regarding

cash collateral usage, the potential appointment of a Chapter 11 Trustee, and the authority of Debtor's general partner to even file a Chapter 11 petition that should be resolved before the Court simply hands the operation of Debtor back to the very entity that brought it to financial ruin.  AgStar respectfully requests that the Court grant its Motion for Excuse from Turnover, and permit VAST to remain Debtor's receiver, at least until these issues are resolved.

Dated this 13th day of July, 2010.

WOODS, FULLER, SHULTZ & SMITH P.C.

By /s/ ROGER W. DAMGAARD
Roger W. Damgaard (#340)
300 South Phillips Avenue, Suite 300
Post Office Box 5027
Sioux Falls, South Dakota 57117-5027
Telephone (605) 336-3890
Fax No. (605) 339-3357
E-mail: Roger.Damgaard@woodsfuller.com
and
Gary W. Koch
Dustan J. Cross
GISLASON & HUNTER LLP
2700 S. Broadway
P. O. Box 458
New Ulm, MN 56073-0458
Phone: 507-354-3111
Fax:  507-354-6310

ATTORNEYS FOR AGSTAR FINANCIAL
SERVICES, PCA AND AGSTAR
FINANCIAL SERVICES, FLCA